Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

VALLEY TOWING CO., INC., a corporation and Robert Dyar, Defendants-Appellees.

No. 73–2896.

United States Court of Appeals, Ninth Circuit.

April 17, 1975.

Donald S. Shire, Asst. U. S. Atty. (argued), Phoenix, Ariz., for plaintiff-appellant.

Richard E. Fay (argued), Phoenix, Ariz., for defendants-appellees.

## OPINION

Before BARNES, WRIGHT and WALLACE, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This is an appeal from a final judgment refusing to enjoin alleged violations of the overtime compensation and record keeping provisions of the Fair Labor Standards Act [29 U.S.C. §§ 201 et seq. (1970)], and to order payment of over $18,000 in unpaid overtime compensation said to be due individual employees of defendant corporation. After a full hearing, the district court concluded that the company's compensation scheme was in compliance with the Act, and that a back pay award on behalf of the company's employees who had worked in excess of the statutory maximum workweek of forty hours between 1969 and 1971 was therefore unwarranted. The district court concluded also that "[t]he evidence fail[ed] to show inadequacy of the books and records of defendants under applicable law and regulation." We affirm in part, reverse in part, and remand for further proceedings.

The Secretary of Labor sued under § 217 of the FLSA, which gives the district courts jurisdiction to restrain violations of § 215 of the Act. In turn, §§ 215(a)(2) and 215(a)(5) respectively make unlawful non-compliance with § 207's provisions for premium overtime compensation, and with regulations regarding record keeping and record preservation promulgated under § 211(c). Relevant portions of these provisions are set out in the margin.[1]

---

1. "§ 207. Maximum hours.

"(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the productions of goods for commerce, for a workweek longer than forty hours unless such employee received compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. . . .

* * * * * *

"§ 211.

At issue was the system devised by Valley Towing and its president, Robert Dyar, for compensating company employees, most of whom are wrecker-drivers. Valley Towing, which provides towing and emergency road service for both business and private customers in and near Phoenix, Arizona, had oral contracts with its drivers under which it paid them guaranteed monthly salaries ranging from $400 to $550 for regular 47 hour, six-day workweeks. The company also had explicit understandings with its employees that those who chose to remain on duty after regular working hours would be compensated either by a flat rate payment of $3.00 per hour, or by being permitted to retain 25% of any gross tow bill.

Aside from unfinished jobs carried over from regular working hours, the employees were free to choose either method of compensation, and it was generally to their advantage to choose the latter. It was stipulated that employees remaining on duty or call beyond regular working hours averaged an additional eight hours each week for a total workweek of 55 hours.[2]

The Secretary does not question the trial judge's characterization of the company's compensation scheme. Rather, he contends that the "oral contracts" and "explicit understandings" referred to in the findings of fact did not satisfy the Act's overtime pay provisions. In particular, he objects to the failure of these agreements to specify a basic hourly rate of pay, and an overtime rate not less than time and one-half that "regular rate" for hours in excess of forty per week.

Absent such specifications, it is asserted, the district court should have determined the "regular rate" of pay by dividing the total weekly compensation paid to each employee by the actual hours worked. The district court should then have awarded such employee an amount representing half of that regular rate for each overtime hour worked in the relevant period.

We agree with the Secretary's argument as to the guaranteed monthly salaries and reverse the district court's determination that disbursements under oral contracts providing for payment of these salaries were adequate to satisfy the Act's overtime pay requirements. However, we do not find the trial court's similar determination as to the compensation plan for afterhours work inconsistent with the Act.

Hence, we affirm the district court's conclusion that the "extra compensation" paid thereunder "is creditable toward overtime compensation and not to be included in computing the regular rate." We also hold that defendants failed to establish any exceptions or exemptions taking them out of the Act's coverage,

---

"(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

\* \* \* \* \* \*

"§ 215. Prohibited acts; prima facie evidence
"(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

"(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title;

"(5) to violate any of the provisions of section 211(c) of this title,

. . . . ."

2. Defendants did not maintain records of the hours worked by each employee on afterhours service calls but the eight hour figure was apparently considered a fair average for those employees working beyond regular working hours.

and that their record keeping and record preservation failed to satisfy § 211(c).

A. *Coverage Under the Act.*

■ Appellees suggest that we might dismiss this appeal on the jurisdictional ground that Valley Towing was not an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of § 203(s).

This contention fails to recognize that the Act provides three independent bases for coverage. Under § 207, the Act's overtime pay requirements apply to each employee "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce, or in the production of goods for commerce." Section 211(c)'s record keeping requirements apply to "[e]very employer subject to any provision of [the Act] or of any order issued under [the Act]."

The Secretary's complaint did not contend that Valley Towing was an "enterprise engaged in commerce," but only that its employees were engaged "in commerce" within the meaning of the Act. The company so stipulated. Since the Act sets out the scope of its overtime requirements in the disjunctive, it is clear that the court had jurisdiction over any § 207 or § 211 violations as to each employee specifically referred to in the pre-trial order embodying that stipulation.[3]

■ Appellees also contend that Valley Towing was exempt from the Act's overtime requirements (and consequently also from its record keeping requirements) because it qualified as a "retail or service establishment" within the meaning of § 213(a)(2). The decisions are uniform that this exemption is a matter of affirmative defense which must be pleaded by the employer, or be waived. *See, e. g.*, Mitchell v. Williams, 420 F.2d 67, 68 n. 2 (8th Cir. 1969), and cases cited therein.

■ Since Valley Towing neither pleaded the § 213(a)(2) exemption, nor offered proof to support each element required for it to be applicable,[4] we shall not depart from those decisions nor from the general rule that an affirmative defense is waived if not pleaded. *See, e. g.*, Sorenson v. United States, 226 F.2d 460, 462 (9th Cir. 1955); Fed.R.Civ.P. 8(c).

■ Moreover, we have narrowed the potential applicability of this exemption to companies providing commercial and private towing services, holding that operations similar to those of appellees failed to fall within the letter, Gray v. Swanney-McDonald, Inc., 436 F.2d 652, 653–54 (9th Cir. 1971), or within the spirit, Brennan v. Keyser, 507 F.2d 472, 476–77 (9th Cir. 1974), of the exemption. Even if appellees had timely raised this defense, it is doubtful that it would have been of any avail to them.

B. *Guaranteed Monthly Salary Plan.*

■ The adequacy under § 207 of both the fixed monthly salary plan and the afterhours compensation agreements must be evaluated in relation to the "regular" rate of pay received by each employee. Therefore, the primary question facing us is how this rate should be determined. Once the regular rate has been established, it will be a simple algorithmic process to determine whether the actual weekly wages paid under each part of the company's compensation

---

**3.** In recent decisions, this court has found employees engaged in similar towing operations to be engaged "in commerce" within the meaning of the Act. Brennan v. Keyser, 507 F.2d 472, 474–75 (9th Cir. 1974); Gray v. Swanney-McDonald, Inc., 436 F.2d 652, 653 (9th Cir. 1971).

**4.** *See* Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

While the company did show that over 50% of its annual sales were made within Arizona, it failed to show that 75% of them were "not for resale," and that 75% of its sales were "recognized as retail in the particular industry." Its contention on oral argument that its largest customers are auto dealerships certainly could not have been conclusive even if introduced below.

scheme satisfied the Act's premium overtime compensation requirements.

At trial, defendants admitted that Mr. Dyar had failed to inform his employees of an hourly rate of pay constituting the basis on which their guaranteed monthly salaries had been determined. They suggest to us, however, that the guaranteed monthly wage contracts did embody "regular" hourly rates, ones readily determinable by rudimentary mathematical calculations.

First, the monthly rates could be transformed into guaranteed weekly scales which provide for payment for 47 hours of work per week. This would involve multiplying the monthly wage by 12, dividing the product by 52. *See* 29 C.F.R. § 778.113(b) (1974).

Second, the guaranteed weekly salary so computed could be broken down into regular and overtime pay components consisting of compensation for 40 hours at a designated hourly rate, plus payments for the remaining seven hours at one and one-half times that rate. The designated hourly rate so determined would exceed the minimum wage even as to lower paid salaried employees, and be considerably above that figure (which during no part of the relevant period exceeded $1.60 per hour)[5] in the case of the company's higher paid employees.[6]

This method of calculating the "regular rate" of pay was apparently accepted by the district court in concluding that appellant had failed to show "by the preponderance of the evidence that defend-

ants have violated the overtime provisions of [§§ 207 and 215(a)(2)] of the Act."[7] Appellees urge that the rates so determined for each employee were the proper ones for the district court to have used in evaluating the adequacy under § 207 of the salaries and compensation for afterhours work paid by Valley Towing.[8]

■ While appellees' position is imaginative, it ignores the established principle that the "regular rate" is not a hypothetical construction but an "actual fact." 149 Madison Ave. Corp. v. Asselta, 331 U.S. 199, 204, 67 S.Ct. 1178, 1181, 91 L.Ed. 1432 (1947). "[I]n testing the validity of a wage agreement under the Act, the courts are required to look beyond that which the parties have purported to do." *Id.*

■ Appellees concede that no stepped-up overtime rate was contemplated for the last seven hours of regular weekly work, much less communicated and agreed to by the employees. Thus the guaranteed monthly salary agreement seems indistinguishable from the one considered by this court in Brennan v. Elmer's Disposal Service, Inc., 510 F.2d 84 (9th Cir. 1975).

In *Elmer's Disposal*, 510 F.2d at 87 we concluded that:

. . . the Act does not allow [an employer] to designate unilaterally what the "regular rate" will be, then, on the basis of that designation, pay employees a predetermined sum for up

---

5. 29 U.S.C. § 206(b) (1970).

6. For those earning the minimum monthly guaranteed salary of $400, the $92.31 average wage per week could be broken down into a regular hourly rate of between $1.82 and $1.83 per hour for the first 40 hours per week, and an overtime rate of $2.73 or $2.735 for the last seven. For those earning $500 per month, the $115.38 weekly salary would translate into a regular rate of $2.29 an hour, and an overtime rate of $3.435. For those earning $550 per month ($126.92 per week), the comparable figures would be $2.51 and $3.755.

7. Neither the findings nor conclusions made clear exactly what the district court determined to be the "regular rate." However, as

the subsequent textual discussion demonstrates, the district court's conclusion that no § 207 violations had occurred would clearly be inconsistent with an acceptance of the Secretary's method of calculating the regular rate for the 47-hour workweek.

8. Appellees concede that insofar as straight overtime at the $3.00 hourly rate was paid, an additional amount would be due under § 207 to those employees in the higher monthly salary brackets. *See* note 6 *supra*. However, the preponderance of payments in excess of the guaranteed wage were made to employees on the basis of 25% of the tow bill, which it appears from the record far exceeded what they would have received at $3.00 per hour.

to fifty hours per work week and one and one-half the designated rate for all hours worked in excess of fifty.

Absent explicit proof of another mutually agreed upon rate of pay, the court must infer that "the regular rate actually paid was substantially that obtained by dividing the weekly wage payable for the working of the scheduled workweek by the number of hours in such scheduled workweek." 149 Madison Ave. Corp. v. Asselta, 331 U.S. at 204, 67 S.Ct. 1178, 1181, 91 L.Ed. 1432. The court must then apply the time and one-half overtime pay provisions to all hours in excess of 40 per week on the basis of that average rate.

*Elmer's Disposal, supra,* actually presented a more difficult situation than that before us. In *Elmer's Disposal,* the company had records showing actual hours worked, and which broke down the salaries of its employees into basic and overnight pay components in the manner which Valley Towing has only demonstrated was theoretically possible. However, the court refused to accept the basic rate of pay stated in the company's records as the statutory "regular rate" for two reasons: (1) the lack of agreement between appellant and its employees as to the hourly rate claimed by the company; and (2) the one-sixth reduction in pay for each day of the six-day week missed, without regard to the hours worked in the week. *Id.,* 510 F.2d at 87.

No evidence in the record here disputes appellees' contention that the guaranteed monthly wage was paid regardless of the actual hours worked. However, as in *Elmer's Disposal,* the district court found no explicit agreement between Valley Towing and its employees on a regular hourly pay scale, to be stepped up for hours in excess of 40. Nor could the testimony of the employees have supported a finding that they viewed their hourly rates of pay as anything other than the per hour arithmetical averages of their guaranteed weekly salaries.[9]

Finally, we note that appellees' position as to the basic 47-hour workweek is inconsistent with the purposes of the Act. In *Elmer's Disposal,* we noted that "[t]he legislative policy of the overtime provisions of the Act is to spread employment throughout the work force by putting financial pressure on the employer, and to compensate employees for the burden of overtime workweeks." 510 F.2d at 87.

■ Neither of these goals is fostered by an agreement under which the hourly salary is invariable throughout a required workweek exceeding 40 hours. It is the "actual fact" of a stepped-up rate for overtime which propagates the goals of the Act, and not the hypothetical retrospective construction of such a rate structure. Consequently, we reverse the district court's determination insofar as it relates to the regular monthly salaries paid by Valley Towing.[10]

**9.** In *Elmer's Disposal,* we reached this same conclusion that no agreement on the company's suggested "regular rate" existed even though some of the employees whose rate of pay was at issue there may have been aware of the company's rate designation because it showed on their payroll checks. 510 F.2d at 86.

**10.** Appellees also contended below that their monthly pay scheme fell within the statutory exception set out in § 207(f). That section provides:

"(f) No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of the maximum workweek applicable

to such employee under subsection (a) of this section if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitates irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 206 of this title (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified."

C. *Afterhours Pay Agreement.*

The district court found that "[t]he extra compensation paid to defendants' employees for after regular hours of employment is creditable toward overtime compensation and not to be included in computing the regular rate." The court apparently based this conclusion on its finding that "compensation by paying the employee 25% of the gross tow bills for . . . work after regular hours, amounted to more than one and one-half times the regular rate of pay."

The Secretary contends that, under § 207(e) of the Act, payments received for afterhours work were as much a part of the "regular" pay of those employees as were their monthly salaries. Therefore, he concludes, earnings from these jobs should also be included in total weekly earnings, and that sum divided by the weekly hours worked to obtain the "regular rate" on which overtime payments for all hours in excess of 40 must be based.

At issue is the interpretation of § 207(e), which provides, in relevant part:

> (e) As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include—

> . . . . .

> (5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day of workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) of this section or in excess of the employee's normal working hours or regular working hours, as the case may be;

> (6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days; or . . ..

The district court found that the undisputedly higher per hour earnings levels for work after regular hours were based on "explicit understandings" between the company and its employees. It is the Secretary's position that these agreements do not provide a sufficient basis on which to characterize either payments at the straight $3.00 rate or those on the 25% commission basis as overtime payments falling within the § 207(e)(5) & (6) exceptions to inclusion in the "regular rate."

The Secretary contends that the "premium rate" required by both § 207(e) (5) & (6) must be based on a regular rate established in good faith and agreed upon by both parties, a factor we have found lacking in the fixed monthly sala-

---

Section 207(f) is a narrow exception added by Congress in 1949 (63 Stat. 446) to codify and limit the principles of two earlier Supreme Court decisions upholding agreements for payment of the same weekly salary to employees working varying amounts of time from week to week. *See* Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056, 91 L.Ed. 1312 (1947); Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1233, 86 L.Ed. 1716 (1942). In Foremost Dairies, Inc. v. Wirtz, 381 F.2d 653 (5th Cir. 1967), the court narrowed the scope of the § 207(f) exception even further. Viewing the exception in light of both the Secretary's administrative interpretation, 29 C.F.R. § 778.406, and that section's statuto-

ry history and central purpose, the court found a so-called "*Belo* contract" invalid where there were only occasional fluctuations in weekly hours, and these fluctuations were only in the number of overtime hours worked. 381 F.2d at 659–61. *Accord*, Hodgson v. Price, 486 F.2d 1406 (7th Cir. 1973) (unpublished opinion), *reported in* 21 Wage & Hour Cas. 342 at 343. In this case, the contracts clearly failed to comply with the requirements of the exception calling for an explicit agreement as to a regular hourly wage. Hence we need not determine whether to follow the reasoning of *Foremost Dairies, supra,* as to the failure of the hours of Valley Towing's employees to fluctuate below the 40 per week level.

ry agreements. Moreover, it is asserted, payments under the afterhours agreements would likely have been viewed merely as additional regular compensation by those receiving them, much like piece rate payments and production incentive bonuses found includable under § 207(e) in earlier decisions of this court and the Supreme Court.[11]

We cannot agree that either of these propositions supports the Secretary's conclusion that these payments are "normal" income properly includable in determining the "regular rate." It is true that the afterhours work pay agreements failed to specify any regular hourly rate of pay for non-overtime hours, as to which the adequacy of the purported overtime pay could be tested. However, it is clear from Part B. above that in this event, the regular rate for each employee can be determined by calculating the quotient of his regular, periodic earnings divided by the hours in that period.

The question becomes whether it was within the district court's discretion to determine that the agreements providing for higher hourly pay for afterhours work were primarily in the nature of overtime pay agreements rather than production incentive arrangements or night shift differentials more properly thought of as part of normal pay. We believe that there was sufficient evidence in the record for the district judge to conclude that the higher hourly pay for afterhours work was both conceived by the company and perceived by the employees as a reward for putting in hours beyond the established workweek. Consequently, the court below properly failed to include pay under these afterhours compensation agreements as part of normal, regular pay to be considered in computing the regular hourly rate.

The Secretary relies heavily on defendant Dyar's admissions that the $3.00 per hour figure was based on the company's ability to pay, and that the 25% commission was also offered without regard to any regular hourly rate of pay. Also, appellees admit that the straight $3.00 rate was inadequate to compensate some of the company's more highly paid workers for their overtime hours worked on a noncommission basis, even if the fixed monthly salaries of those employees were translated into "regular rates" at the lower levels resulting from using appellees' proposed method of conversion (see note 6 supra), rather than that found in Part B. to be the correct method.

We do not find that these facts alone required the district judge to treat disbursements under the $3.00 or 25% option as primarily regular rather than overtime pay. So long as he could conclude from the evidence that these payments were viewed by both parties as involving a premium above the rate of pay for similar work during the regular work week,[12] the occasional failure of

11. See, e. g., Walling v. Harnischfeger Corp., 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711 (1945); Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424–26, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945); United States v. Rosenwasser, 323 U.S. 360, 363–64, 65 S.Ct. 295, 89 L.Ed. 301 (1945).

12. There was no evidence offered, as there had been in Elmer's Disposal, supra, to suggest that what the company characterized as the overtime rate was in actuality the same rate offered during regular hours. In Elmer's Disposal, it was shown that if an employee failed to show up for work one day of his scheduled six-day workweek, his pay was reduced by one-sixth of the weekly salary instead of by a larger proportion representing the ostensibly higher marginal rate of pay for hours over 40.

510 F.2d at 88. In the case before us, the evidence was overwhelming that the rate of pay was substantially stepped up for evening and weekend work.

The cases cited by the Secretary, see note 11, supra, are similarly distinguishable. Of course, the company could not avoid its premium overtime pay obligations merely by denominating certain of its assigned work as "nonemergency towing" and other of its regularly assigned work as "emergency towing." See Walling v. Alaska Pacific Consol. Min. Co., 152 F.2d 812, 815 (9th Cir. 1945). But in the case before us, the overtime work was generally done on a voluntary basis, and compensated at rates not offered to any employees during "regular" working hours. As a consequence, the court could certainly have concluded that

payments under one or the other of the compensation options to amount to a full time and one-half the rate for the first 47 hours should best be viewed as affecting only the amount of the necessary back pay award, not the characterization of all such payments made.

This is not a case where there has been no attempt to pay a stepped-up rate for overtime hours. Even using the method we have found the correct one for calculating the "regular rate" of pay for those employees working only the basic 47-hour week, no employee's average salary would exceed $2.70 per hour for those hours.[13] Thus in no case was the straight $3.00 overtime rate less than the rate of pay during normal working hours, even though some of those employees would be entitled to additional compensation necessary to raise them to a full time and one-half of their non-overtime rates. And where the company's drivers took the 25% commission option, payments under which constituted the overwhelming majority of the company's non-guaranteed wage payments, they agreed that they made considerably more than the $3.00 per hour figure.[14] From these facts, the district judge

could well have found that these higher payments were intended as compensation for the late or weekend hours during which they were offered.[15]

The cases cited by the Secretary do not undermine this conclusion. Instead, they merely pose in different contexts the identical question raised by this case: under the actual facts of the company's compensation plan, should certain payments be viewed as normal income or overtime compensation? For example, in Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424, 65 S.Ct. 1242, 1245, 89 L.Ed. 1705 (1945), the Supreme Court stated:

> The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, *exclusive of overtime payments*. [Emphasis added.]

Nor does our determination in any way disserve the statutory policy of spreading the work and reducing the burden on workers. Once the district judge has determined that an express agreement has been reached by both parties providing for a higher rate of

---

the towing done pursuant to the afterhours pay agreements was compensated at a higher rate because of the additional hours of work involved. And since it involved basically the same types of work as done during the regular workweek, the *properly calculated rate for those hours could constitute the basis for determining the minimum overtime rate.*

13. The $2.70 figure can be arrived at by multiplying the maximum monthly wage of $550 by 12 and dividing by 52, and again by 47. In the case of the lowest-paid drivers, those earning $400 per month, their "regular rate of pay" thus calculated would amount of $1.96 per hour.

14. Some employees made as much as $200 per month from their after hours work on top of their regular salaries. Time and one-half, however, constitutes only the minimum premium rate to be paid, not the limit. Walling v. A. H. Belo Corp., 316 U.S. 624, 632, 62 S.Ct. 1223, 86 L.Ed. 1716 (1942). Thus no presumption should arise that the 25% commissions on afterhours local towing jobs were part of the normal pay just because they were unrelated to the regular salaries, and considerably larger

than them. These amounts could lead to the conclusion that a greater amount than regular pay was fair and necessary to induce workers to remain on call beyond the statutorily (and the contractually) prescribed hours of regular work. The fact that these payments did not vary from driver to driver, despite different "regular" salary levels, is also not indicative of any violation of the Act, as long as the minimum time and one-half premium rate was paid to each employee.

The only employee who appears not to have received a stepped-up rate for any of his overtime hours was James Roeder. Roeder, a student on summer vacation, worked 135 hours in a two-week period and was paid $270. The district court should enter a back pay order for Roeder to receive an additional $1.00 for each hour he was employed in excess of the statutory maximum hours of work.

15. *See* Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 465, 68 S.Ct. 1186, 1197, 92 L.Ed. 1502 (1948) (defining "overtime premium" as "extra pay for work because of previous work for a specified number of hours in the workweek or workday."

hourly pay for overtime hours than for the first 40 hours per week, or eight per day, it remains for the court only to determine the sufficiency of that overtime pay rate in comparison with the rate separately agreed upon for the non-overtime hours.

 Congress intended the courts to have some flexibility in determining whether wage payment plans were in substantial compliance with the Act. *See* Walling v. A. H. Belo Corp., 316 U.S. 624, 634–35, 62 S.Ct. 1223, 86 L.Ed. 1716 (1942). And while we are not unmindful of the general rule that exceptions to remedial statutes are to be construed narrowly, they should also be construed sensibly, and to give effect to statutory purposes. *Cf.* State of California v. Environmental Protection Agency, 511 F.2d 963, 974–75 (9th Cir. 1975). The statutory purpose would not be served here by implementing the Secretary's interpretation of the Act.

The Secretary would throw all Valley Towing's wage payments to its employees into one pot, and calculate the overtime due each on the basis of these total earnings. This would require the company to pay overtime not only on what the district court found to be regular salary payments but also on payments found already to include an overtime premium element.

 We agree with the district court that overtime need not be paid on overtime in this manner, but rather need be paid only to the extent that the overtime payments fell short of a full one and one-half times the regular hourly rate. Nevertheless, we must remand for a determination of the sufficiency of the company's overtime payments in light of Part B., *supra* (redetermination of the "regular rate"), and of the admonition in Part D., *infra*, that compensation for each overtime hour worked must independently satisfy the time and one-half requirement.[16]

### D. *Overtime Pay Awards.*

On remand, the district judge should proceed as follows:

 *First,* he must calculate the "regular rate" of pay for each employee in each week, based on the average hourly salary for the 47 guaranteed hours. This method is described in note 13, *supra.*

*Secondly,* he should award back pay for the last seven hours worked in each regular work week, in the amount of one-half of the rate determined in step one.

*Third,* he should award additional overtime compensation for those hours in excess of 47 worked at the straight $3.00 rate, but only to the extent that such

---

**16.** In view of its disposition of the afterhours pay issue, the district court did not need to rule on the company's remaining defense that its pay plan qualified for a § 207(g) exception. In relevant part, that section reads as follows:

"(g) No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection—

"(1) in the case of an employee employed at piece rates, is computed at piece rates not

less than one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or

"(2) in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours;

. . . . .."

The section is inapplicable. Appellees relied on the inapplicable language of § 207(g)(1) in their arguments below. Under the reasoning of our discussion in Part A., *supra*, they may not raise a § 207(g)(2) defense at this stage.

hourly rate falls short of one and one-half times the rate determined in step one for each particular employee.

*Fourth*, in the case of those overtime hours compensated at the 25% commission rate, the district judge should award additional pay in the unlikely event that this commission in any instance amounted to less than time and one-half the regular rate of any employee. This can be done from evidence in the record, including the exhibits, further findings of fact, or by stipulation as to what constitutes a reasonable time estimate for towing jobs of any given mileage. Alternatively, the judge may avoid step *four* if he makes a determination that average weekly compensation from commissions, reduced to an hourly figure based on a stipulated weekly hours figure or some other reasonable estimate, was more than adequate to comply with the time and one-half premium pay requirement of § 207.

In making the computations called for in steps *two* and *three*, the court should not credit against the resulting back pay liability any amount representing an excess of the average hourly pay from step *four* earnings over one and one-half times the step *one* rate. Allowing the company to "credit" the "excess" pay for some overtime hours against the insufficient pay for others, would not undermine the Act's purpose of providing a minimum premium level of pay to compensate employees for the burden of working excess hours.

However, it would undermine the Act's co-equal purpose of presenting the company with a marginal disincentive of at least a 50% premium over the worker's ordinary pay for *each* hour it seeks to work its employees beyond the statutory maximum. Consequently, the district court was in error to the extent that it credited "excess" compensation from afterhours towing commissions against insufficient overtime pay for hours 41 through 47 or for "straight" $3.00 overtime hours.

As to employee Roeder, the district court should proceed as suggested in note 14, *supra.*

Once these calculations have been made, the district court should award back pay to each employee in the amount due from the step *two* and step *three* calculations (and from step *four*, if in any instance the 25% commission rate afforded insufficient overtime compensation).

### E. *Record Keeping Violations.*

We agree with appellant that the district court erred in holding that appellees were not in violation of the Act's record keeping requirements. Once the company became subject to the overtime provisions of § 207, it was obliged to comply with the Secretary's record keeping regulations promulgated under § 211(c). These require, *inter alia*, that employers "maintain and preserve" records of the "regular hourly rate of pay for any week when overtime is worked and excess compensation is due under [§ 207(a)] . . . .." 29 C.F.R. § 516.2(a)(6). Employers are also required to maintain records of the "hours worked each workday and total hours worked each workweek." 29 C.F.R. § 516.2(a)(7).

Appellees admittedly failed to record the applicable hourly rates, and to preserve the records of regular and "straight" overtime hours worked once the monthly paychecks were computed. No attempt was made to record the hours spent on towing carried out on the commission basis.

On remand, the district judge should order appellees to comply with the Act's requirements in these respects. All wages, including monthly salaries as well as overtime pay, should be broken down into hourly rates in accordance with the standards set out herein, and recorded alongside the actual hours worked by or credited to each employee at each rate. It should not be burdensome to the employer and drivers to arrive at reasona-

ble estimates of time spent on commission towing. Hourly pay for this work should be substantially above what § 207 requires anyway, so these estimates need only be reasonable and not mathematically precise.

Although we have concluded that appellees violated the Act's record keeping requirements, the district court in ordering relief in this regard need not go beyond an order requiring prospective compliance. As to overtime wages due, the record seems sufficient for the district judge to proceed with the determination of back pay awards pursuant to the approach outlined in Section D.

No additional sanction for past record keeping violations seems warranted, unless the district court should determine that there is no reasonably accurate means of determining from the records available to him what overtime pay is due each employee. In that event, absent additional stipulation, he may make reasonable estimates of the weekly hours worked by each employee at his salaried rate, and at the $3.00 rate, and on the commission basis. If such a determination must be made because of inadequate records, appellees will have little standing to challenge whatever figures are arrived at. *Cf.* Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 946 (2d Cir. 1959) (noting that in some circumstances, the Act requires the company " 'at its peril . . . to keep track of the amount of overtime worked by . . . its employees . . . .' George Lawley & Son Corp. v. South, 1 Cir., 140 F.2d 439, 442 . . . .")

This case is remanded to the district court for further proceedings consistent herewith.