**In re GULL AIR, INC., Debtor.**

**GULL AIR, INC., Plaintiff,**

v.

**BEECH ACCEPTANCE CORPORATION, INC., Defendant.**

Bankruptcy No. 87–10333–JNG.
Adv. No. 87–1151.

United States Bankruptcy Court, Massachusetts.

Jan. 25, 1988.

Peter J. Haley, Gordon & Wise, Boston, Mass., for plaintiff.

Richard L. Levine, Hill & Barlow, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matters before the Court are a Motion for Summary Judgment filed by Gull Air, Inc. ("Gull") and an objection to that motion, as well as a Cross-Motion for Summary Judgment, filed by Beech Acceptance Corporation, Inc. ("Beech"). There are no issues of material fact in dispute. Consequently, the matters are ripe for summary judgment pursuant to Fed.R.Civ.Pro. 56(c), which is made applicable to this proceeding by Bankruptcy Rule 7056.

Gull filed the instant adversary complaint against Beech on July 9, 1987, approximately four months after the filing of its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 10, 1987. The initial complaint filed on July 9th contained two counts. However, Gull filed an amended complaint on September 8, 1987. That complaint contains only one count for the recovery of voidable preference payments totalling $480,000. See 11 U.S.C. § 547(b) (West 1987).

Gull, in its Motion for Summary Judgment, argues that it has met all the elements of the statutory test for the recovery of a preference under section 547 and is entitled to recover the amount of the transfers made to Beech within 90 days of the filing. Beech does not contest the fact that Gull has established the requisite elements under section 547(b). However, it contends that the payments in question were made in the ordinary course of business and thus are protected from the preference rule. See 11 U.S.C. § 547(c)(2) (West 1987).

## FACTS

In 1983, Beech financed the sale of three CASA 200–212 airplanes to Gull, evidenced by three promissory notes and security agreements. Each note was in the principal amount of $1,866,667 and called for a monthly payment of $27,871.34.[1] Gull defaulted on its obligations to Beech sometime before August 1986. In that month, Beech commenced an action against Gull in the United States District Court for the

---

1. Beech notes that the monthly obligations of Gull actually fluctuated because the interest rates provided for in the notes were variable. The amount paid by Gull under all three notes was approximately $80,000 per month.

District of Kansas to collect all amounts due and owing under the notes.

Following the commencement of the civil action, Gull and Beech negotiated a work-out agreement that was executed by the parties on November 10, 1986. The work-out agreement provided that Gull would make payments of $80,000 to Beech "effective September 29, 1986 and every month thereafter on the 29th until the notes are paid in full." The agreement also provided that after three months Beech would be entitled to an additional $80,000 per month payment which would be applied to the arrearages under the notes. Beech thus received the following payments under the workout agreement:

| 9/30/87 | $ 80,000 |
| 12/1/87 | $160,000 |
| 12/30/87 | $160,000 |
| 1/29/87 | $160,000 |
| 3/5/87 | $160,000 |

The last three payments fall within the preference period. Additionally, pursuant to the agreement, the last three payments were made to Beech from Gull's Airline Clearing House, Inc. accounts receivable. Notably, the workout agreement states: "[i]n consideration of the execution of this agreement, BACI [Beech] shall dismiss its lawsuit without prejudice."

At the time the December 30th, January and March transfers were made, Gull was insolvent. Moreover, at the time the transfers were made and on the date of the filing of the petition, the value of the three CASA aircraft was less than approximately $2,000,000, and the amount due and owing Beech was approximately $5,000,000. Accordingly, the $480,000 transferred to Beech enabled Beech to receive more than it would receive if this were a case under Chapter 7, the transfers had not been made and Beech received payment to the extent provided by Title 11. Gull's disclosure statement estimates that a liquidation under Chapter 7 would result in a possible dividend to unsecured creditors of no more than 10%. Thus, the $480,000 transferred is clearly more than Beech would receive on the unsecured portion of its claim, i.e.,

its deficiency claim of approximately $3,000,000.

## DISCUSSION

Since, Beech does not dispute Gull's position with respect to section 547(b), it is evident that Gull would be entitled to summary judgment absent a showing by Beech that the transfers were in the ordinary course. Thus, the only issue is whether the payments totalling $480,000 made pursuant to the workout agreement were made in the ordinary course of business between Gull and Beech.

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—...

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms....

11 U.S.C. § 547(c)(2) (West 1987). Section 547(g) further provides that a creditor or party in interest against whom the recovery or avoidance of a preference is sought has the burden of proving by a preponderance of the evidence the nonavoidability of a transfer under section 547(c)(2). 11 U.S.C. § 547(g) (West 1987).

The Court recently had the opportunity to examine section 547(c)(2) in *In re First Software Corp.*, 81 B.R. 211, 212–13 (Bankr.D.Mass.1988). This Court observed:

The purpose of the ordinary course of business exception to the trustee's power to avoid preferential transfers is "to leave undisturbed normal financial relations [of the debtor], because [they do] not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 337 (1977), *reported in* 1978

U.S.Code Cong. & Admin.News 5963, 6329. Consequently, the exception is intended to " 'encourage creditors to continue short term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it.' " *In re Southern Commondity Corp.*, 78 B.R. 626, 628 (Bankr.S.D.Fla.1987), *quoting In re Morris*, 53 B.R. 190, 192 (Bankr.D.Or.1985).

The Bankruptcy Code does not define "ordinary course of business." Accordingly, the Court must focus on the conduct of the parties involved. In other words, " 'ordinary' contemplates what is ordinary with respect to the parties." *In re Fulghum Construction Corp.*, 78 B.R. 146, 152 (Bankr.M.D.Tenn.1987). The factors the Court should consider to determine whether a transferee has established the requirements of section 547(c)(2) include: 1) the prior course of dealing between the parties; 2) the amount of the payments; 3) the timing of the payments; and 4) the circumstances surrounding the payments. *In re White*, 58 B.R. 266, 269 (Bankr.E.D.Tenn. 1986). Additionally, the Court should narrowly interpret section 547(c). *In re Fulghum Construction Corp.*, 78 B.R. at 152. *See, e.g., U.S. v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979); *Brennan v. Valley Towing Co., Inc.*, 515 F.2d 100 (9th Cir.1975).

*Id.*

Beech argues that 1) that the transfers in question were made in payment of debts incurred by Gull in 1983 and 1984 in the ordinary course of Gull's business; 2) that the transfers were made in the ordinary course of business; and 3) that the transfers were made according to business terms common in the airline industry. With respect to its second argument, Beech emphasizes that $80,000 of each monthly payment was Gull's payment of its installment obligations under the notes and that the $80,000 arrearage payments were not payments designed to pressure Gull or extract last minute concessions. Indeed, Beech maintains that the arrearage payments were arranged within a significant period of time before they were to begin and could be paid in an orderly fashion over time. With respect to its third argument, Beech insists that it is within its ordinary business practice to enter into workout agreements, and it is common for airlines to assign their clearing house accounts receivable to their creditors.

Beech cites *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr.W.D.Okl.1986), in support of its position. In that case, the debtor entered into a workout agreement with its creditors, including the preference defendant, approximately two years prior to the filing of its bankruptcy petition. As part of the workout arrangement, the debtor and the defendant agreed to restructure the debtor's outstanding debt. Accordingly, the debtor executed a promissory note providing for the payment of monthly installments to the defendant over a seven year period. The bankruptcy court concluded that "the mere restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances." *Id.* at 273. It also found that, in view of mutual benefit derived from the workout and the exchange of services for payment, the transactions were neither unusual nor extraordinary. *Id.* at 274. Finally, it took judicial notice that the terms of the workout were well within ordinary business terms.

Given the magnitude of the payments in question, the Court understands Beech's position. Indeed, the Court has no serious reservations about Beech's arguments with respect to subsections 547(c)(2)(A) and (C). However, the Court is unconvinced by its legal argument with respect to section 547(c)(2)(B). As Gull correctly points out, Beech overlooks the fact that the transfers pursuant to the workout agreement were in response to the civil action and were not consistent with the prior transactions between the parties. Notably, an additional $80,000 was required for the payment of arrearages and the payments were made directly from Gull's airline clearing house account.

In *Matter of Craig Oil*, 785 F.2d 1563 (11th Cir.1986), the Court of Appeals for the Eleventh Circuit stated:

**4**

It seems clear ... that § 547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. *To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of section 547(c)(2).* Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

785 F.2d at 1566. *See also In re Alter Hall Construction Company Inc.,* 73 B.R. 989 (Bankr.D.Mass.1987). The connection between the payments and the dismissal of the civil action instituted by Beech in Kansas is explicitly stated in the workout agreement. In view of its prior opinion in *In re Alter Hall* and the purpose of section 547(c)(2), the Court cannot overlook that connection. Moreover, the case most heavily relied upon by Beech, *In re Magic Circle Energy Corp., supra,* is factually distinguishable in key respects. In the reported decision, there was no suggestion that a civil action had been commenced prior to the execution of the workout agreement. Moreover, in that case, unlike the instant proceeding, the workout agreement governed the relationship between the parties for at least one and one half years instead of less than six months.

In view of the foregoing, the memorandum and arguments of counsel, whether or not specifically mentioned herein, the Court hereby overrules Beech's objection to Gull's Motion for Summary Judgment, denies Beech's Motion for Summary Judgment and enters Summary Judgment in favor of Gull in the amount of $480,000. So ordered.