In re GULL AIR, INC., Debtor.

GULL AIR, INC., Plaintiff,

v.

EMBRAER AIRCRAFT CORPORATION, Defendant.

Bankruptcy No. A88–1012–JNG.
Adv. No. 88–1012.

United States Bankruptcy Court, D. Massachusetts.

Aug. 12, 1988.

order as is just.

Peter J. Haley, Gordon & Wise, Boston, Mass., for plaintiff.

A. Van Lanckton, Craig and Macauley, Boston, Mass., for defendant.

### MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

Gull Air, Inc. ("Gull" or "Gull Air") commenced the above captioned adversary proceeding against Embraer Aircraft Corporation ("Embraer") on January 12, 1988. Through its complaint, Gull seeks the recovery of three payments of $50,000 each as voidable preferences.[1] Embraer filed a timely answer. The matters now before the Court are the motion for summary judgment filed by Embraer and the opposition to that motion and a cross-motion for summary judgment filed by Gull Air. No material facts are in dispute. Accordingly, the adversary proceeding is ripe for summary judgment pursuant to Bankruptcy Rule 7056.

### FACTS

Embraer and Gull entered into two aircraft lease agreements dated November 15, 1985 for the lease of two Embraer aircraft for a 24 month term. The leases required Gull to make rental payments on the first

---

1. Gull now seeks to recover only two of the    payments.

of each month. Gull commenced the monthly payments, but in the fall of 1986 Gull's Vice President for Finance Chris Zawada ("Zawada") received several calls from David Sage ("Sage"), Embraer's Manager–Commercial Finance regarding past due amounts. As a result, on November 13, 1986, Zawada on behalf of Gull Air sent a letter to the Aerospace Division of Chase Manhattan Bank, as agent for the the the Airlines Clearing House, Inc. ("ACH"), directing the clearing house to pay to Embraer a monthly amount of $50,000 to the extent Gull's proceeds from the clearing house equalled that amount.[2] The November 13th letter provided in relevant part:

> ... This letter is to notify you that pursuant to various Lease Agreements dated in Decembver [sic] 1983 between us and Embraer ... we have incurred certain obligations to EAC [Embraer] and have assigned to EAC on account of said obligations a monthly amount as indicated in the attached schedule.
>
> *       *       *       *       *       *
>
> Such claims by EAC are to be paid to EAC from Passenger Revenue, Air Freight, IATA, UATP and miscellaneous net settlement amounts received, and normally payable to us, by you as agent to ACH. Accordingly, we hereby authorize and direct you to pay to EAC ... the monthly amount of $50,000 (fifty thousand). In the event the amount available is less than EAC's claim, all proceeds shall be sent to EAC. Any excess shall be immediately payable to us. The terms and conditions of this letter shall commence upon actual receipt of this letter by your Aerospace Division.
>
> *       *       *       *       *       *
>
> It is understood that no such settlement amount shall be so paid until (i) at least 24 hours after such amount has been credited to our account with you and (ii) all then existing debts owed by us to members and associate members of ACH

or the IATA Clearing House, notification of which debts has been duly submitted to you and for which settlement is to be made by you as agent for ACH, are in your reasonable determination fully satisfied. It is further understood that neither of these conditions may be waived by you or us. This is a continuing authorization and direction....

A copy of the November 3, 1986 letter was delivered to and received by Embraer. The letter did not have the effect of causing any payments to be made to Embraer until January 29, 1987 when Embraer received the first of the two $50,000 payments at issue by wire transfer. On March 4, 1987, Embraer received the second payment by wire transfer directly from Gull's Airlines Clearing House account. Gull filed its Chapter 11 petition on March 10, 1987. Gull Air had never made payments to Embraer from its ACH account prior to January 29, 1987.

### DISCUSSION

#### I

■ Section 547(b) of the Bankruptcy Code provides in relevant part that

> ... [a] trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; ... and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;

---

**2.** According to the affidavit of Chris Zawada:

As a participant in the Airline Clearing House Gull would submit each month its airline receivable report to the clearing house and, after deducting from Gull's account its airline

payables as submitted by the other airlines, the clearing house would charge Gull's account with a net credit or net debit, depending on the resolution of that month's accounts.

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (West 1988). Embraer does not concede that all the elements of section 547(b) have been met. In particular, it argues that Gull has not satisfied section 547(b)(4) because the "transfer" in this case was made on November 3, 1986 more than one month before the commencement of the 90 day preference period, i.e., December 10, 1986. Citing *Goldstein v. Madison National Bank of Washington, D.C.*, 807 F.2d 1070 (D.C.Cir.1986); *In re Trejo*, 44 B.R. 539 (Bankr.E.D.Cal. 1984); *In re Moskowitz*, 14 B.R. 677 (Bankr.S.D.N.Y.1981); and *McLaughlin v. New England Telephone & Telegraph Co.*, 345 Mass. 555, 188 N.E.2d 552 (1963),[3] Embraer maintains that the date of Gull Air's assignment, i.e., November 3, 1986, not the date of payment, determines when a transfer is made. It correctly notes that an assignment is made when the assignor intends to assign a present right, identifies the subject matter assigned and divests itself of control over the subject matter assigned. *In re Moskowitz*, 14 B.R. 677, 681 (Bankr.S.D.N.Y.1981). In the absence of an applicable statute the manifestation of present intention need not be in writing. *See generally* J. Calamari and J. Perillo, *The Law of Contracts* §§ 18-1-18-5 (1977).

Embraer argues that the "transfer" in this case involved Gull Air's present intent to divest itself of control over passenger and freight receivables identified in the November 3, 1986 letter. Embraer views the November 3rd letter as an "absolute, irrevocable, and continuous" assignment.

Gull Air, on the other hand, maintains that the November 3, 1986 letter is much more limited in scope and effect than Embraer would have the Court believe. Gull Air makes the following points: 1) the purpose of the letter was only to authorize and direct the payment of $50,000 per month; 2) the letter does not reflect a present intent to make an assignment or a present transfer of any rights; 3) Gull Air did not release its rights to later alter or revoke its direction in the letter; and 4) the authorization was not absolute and irrevocable as it did not state either a monetary limit or a specific duration.

The Court notes that the only evidence of what the parties intended is the November 3rd letter, which is no more than a continuing direction and authorization to ACH. Gull is correct in observing that it did not irrevocably divest itself of control over its ACH proceeds, and indeed it conditioned their payment to Embraer.

Gull also emphasizes that it continued to receive clearing house funds without any deduction for Embraer's interest until January 29, 1987, and, since those funds were available to Gull, they also were available to any of Gull's potential attaching creditors. In other words, one of Gull's creditors could have acquired an interest in the property superior to any interest Embraer might have obtained by the November 3, 1986 letter so that no transfer could be deemed perfected.

In this regard, Gull highlights section 547(e) of the Bankruptcy Code. That section provides in relevant part:

(e)(1) For purposes of this section—

(B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

(2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the

3. Embraer also cites the *McLaughlin* case as standing for the proposition that an assignment of accounts receivable is made and perfected on the date of the writing and gives the assignee superior rights as against a bankruptcy trustee and subsequent lien holders. The *McLauglin* case was decided under General Laws ch. 107A, §§ 1 and 2 which was repealed by the Uniform Commercial Code. The court interpreted §§ 1 and 2 to apply only to accounts receivable where the assignor had performed and nothing remained to be done except payment. 345 Mass. at 564. Embraer's citation of the *McLauglin* case, therefore, is not conclusive.

transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; or

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

11 U.S.C. § 547(e) (West 1988).

Section 547(e)(3), in conjunction with section 547(c)(5) of the Bankruptcy Code, was intended to overrule *DuBay v. Williams* 417 F.2d 1277 (9th Cir.1969) and *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co.*, 408 F.2d 209 (7th Cir.1969). In the latter case, the court held that a transfer was completed when a secured party perfected a security interest in accounts receivable and that no transfer occurred when the proceeds from the accounts receivable were paid to the secured creditor. Section 547(e)(3) thus allows a trustee to avoid as preferences security interests in after acquired property unless the creditor is able to establish one of the preference exceptions.

The time at which a transfer occurs turns on whether a financing statement under Article 9 of The Uniform Commercial Code is necessary to perfect the assignment. *See Goldstein v. Madison National Bank of Washington D.C.*, 807 F.2d 1070, 1071–72 (D.C.Cir.1986). The parties did not raise the issue of whether the assignment in this case falls outside the purview of Article 9 of the Uniform Commercial Code.[4] The Court will assume without deciding that Article 9 is inapplicable because it appears likely that the assignment was for the purpose of collection only. The Court

notes that Gull was required to pay a basic rent of $18,500 per month under one aircraft lease and $16,500 per month under the other. Additionally, Gull was obligated to pay $15 per engine per flight hour toward an engine maintenance reserve under both leases. Accordingly, the $50,000 monthly payment appears to be a "guesstimate" of the monthly rental charges for the two aircraft.

■ However, the issue of whether section 547(e)(3) applies only to after acquired property clauses in secured transactions must be addressed by the Court. Even assuming the assignment was effective prior to the 90 day period before the bankruptcy filing, if section 547(e)(3) applies to assignments, as well as to secured transactions, the two $50,000 payments may be preferential.

Thus, Gull Air argues that even if the Court should find that the November 3, 1986 letter was an effective assignment, section 547(e)(3) precludes an effective assignment of future accounts receivable until those accounts actually come into existence. Gull cites *In re Diversified World Investments, Ltd.*, 12 B.R. 517 (Bankr.S.D. Tex.1981) in support of its position.

In that case, the debtor leased an aircraft to a third party, Aramco Overseas Co. The debtor then assigned the rental payments from Aramco to one of its creditors, Omni International Ltd., prior to the preference period. When the payments came due, the third party lessee paid the creditor during the preference period. The bankruptcy trustee sought to recover the payments made during the 90 days preceding bankruptcy as preferences. The bankruptcy court, in denying Omni's motion to dismiss, stated:

Although not specifically considered by the legislative history, the court believes that § 547(e)(3) was intended to bring payments made pursuant to an assignment within the term 'transfer'. Under § 101(40) the term transfer was intended

---

4. An assignment of an account which is for the purpose of collection only or a transfer of an account to an assignee in whole or partial satisfaction of a pre-existing indebtedness is not subject to Article 9 of the Uniform Commercial Code. *See* Mass.Gen.Laws Ann. ch. 106, § 9–104(f) (West 1958 & Supp.1988).

to be 'as broad as possible', H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) 314; S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978) 27, and § 101(40) clearly includes indirect payments. Furthermore, when § 547(e)(3) is read together with § 101(40) it appears to the court that the rental payments from Aramco to Omni were indirect transfers made for the benefit of Diversified as the rental payments were intended to reduce Diversified's indebtedness to Omni. Thus, while indirect, the rental payments were made when Diversified obtained a right to receive them and not at the time of the assignment. Omni occupies a position analogous to that of the secured creditor in *Grain Merchants, In re Cox,* 10 B.R. 268, 271 (Bkrtcy.D.Md.1981), with the difference being that the transfer is indirect rather than direct.

The lease that generated the payments to Omni was between Diversified and Aramco. Had that lease been terminated for any reason Omni would not have been entitled to receive the rental payments. Accordingly, Omni had rights to the lease payments only as they were made by Aramco, notwithstanding the previously executed assignment. The debtor did not acquire any right to the rentals except as they became due from Aramco. Thus under § 547(e)(3) the transfer was not made until such time as the rents accrued under the terms of the lease.

12 B.R. at 519. The facts in the *Diversified* case are remarkably similar to the facts in the instant case. Moreover, the *Diversified* reasoning appears in a line of cases dealing with garnished wages. *Cf. In re Walters,* 61 B.R. 426 (Bankr.D.Mont. 1986); *In re Krumpe,* 60 B.R. 575 (Bankr. D.Md.1986); *In re Dunn,* 56 B.R. 275 (Bankr.M.D.La.1985); *In re Perry,* 48 B.R. 591 (Bankr.M.D.Tenn.1985); *In re Tabita,* 38 B.R. 511 (Bankr.E.D.Pa.1984). *Contra In re Conner,* 733 F.2d 1560 (11th Cir. 1984); *In re Coppie,* 728 F.2d 951 (7th Cir.1984); *In re Riddervold,* 647 F.2d 342 (2nd Cir.1981); *In re Harrington,* 70 B.R. 301 (Bankr.S.D.Fla.1987).

The *In re Diversified World Investments, Ltd.,* 12 B.R. 517 (Bankr.S.D.Tex. 1981), case has been criticized, however. Collier complains that

[u]nder the court's reasoning, section 547(e)(3) would provide the trustee with a potent weapon for avoiding legitimate security arrangements, a result not intended by Congress. In fact the debtor [in the *Diversified* case] had assigned its interest in the rentals long before bankruptcy and had nothing to transfer during the 90–day preference period.

4 *Collier on Bankruptcy* ¶ 547.17[7] at 546–67 (15th ed. 1988). Additionally, Bankruptcy Judge Krechevsky refused to follow the *Diversified* case in *Matter of E.P. Hayes, Inc.,* 29 B.R. 907 (Bankr.D.Conn. 1983). *See also In re Long Chevrolet, Inc.,* 79 B.R. 759, 765–66 (Bankr.N.D.Ill. 1987).

The issue in the *Hayes* case was whether payments by the debtor made during the preference period to a creditor pursuant to a pre-preference period assignment which transferred the debtor's right to a portion of earnings under a bus service contract with the Board of Education for the Town of Enfield, Connecticut were avoidable under section 547. The assignment was for the purpose of additionally securing indebtedness of the debtor to the creditor, and it authorized the school district to pay the creditor. The creditor argued that the payments by the town to the debtor were not property of the estate. The trustee based his position on section 547(e)(3) of the Bankruptcy Code, arguing that the preference period payment dates were the transfer dates because prior thereto the debtor had no right to the payments since it had not performed the services giving rise to the right to receive the payments. The court disagreed, stating "no basis exists for construing § 547(e)(3) as affecting settled law beyond its effect on after-acquired property clauses." 29 B.R. at 911. According to Judge Krechevsky, the payments received by the creditor were not after acquired property but a receivable

within the meaning of 547(a)(3)[5] that was acquired at the time the debtor's contract with the town was executed and that was transferred to the creditor at the time of the assignment.

This Court agrees with those courts that have noted:

[n]othing in the legislative history or statutory language itself, however, implies that the provisions of § 547(e)(3) are limited to transfers involving security interests in after acquired collateral. The unambiguous and clear language of the statute requires that the provisions of § 547(e)(3) apply to all transfers which are attacked as preferential, including a judicial lien obtained by a garnishment proceeding.

*In re Eggleston,* 19 B.R. 280, 284 (Bankr. M.D.Tenn.1982); *See also In re Tabita,* 38 B.R. 511 (Bankr.E.D.Pa.1984). Accordingly, this Court finds itself in agreement with the court in *In re Diversified World Investments, Ltd.,* 12 B.R. 517 (Bankr.S.D. Tex.1981), and will apply section 547(e)(3) to determine when the "transfer" was made in this case.

■ The next issue to be decided then is when did the Debtor acquire rights in the ACH proceeds purportedly assigned to Embraer on or about November 3, 1986. It is clear to the Court that the situation in the instant case is distinguishable from the arrangement between the debtor and the town in the *E.P. Hayes, Inc.,* case. It appears to the Court that what Gull was assigning to Embraer was future accounts receivable which it generated at the time it sold passenger tickets. Any rights to payment whether or not earned by performance that Gull had arose monthly and were not necessarily in existence on November 3, 1986. Additionally, according to the Zawada affidavit, Gull had no "right to payment whether or not earned by performance" with respect to its ACH monthly settlement amount. It was only after the ACH's monthly process of crediting Gull its receivables and debiting its payables that Gull obtained a net credit or debit. This analysis also is consistent with the two express conditions set forth in the last paragraph of the November 3, 1986 letter quoted above, namely that no settlement amount be paid to Embraer in full or in part until (i) at least 24 hours after such amount had been credited to Gull's account; and (ii) all of Gull's existing debts to ACH members had been satisfied. Accordingly, the Court finds that the transfers in question took place within the preference period, and Gull has established the requisite elements of a preference for the two payments in question.

II

■ Recognizing the possibility that the Court might conclude that the payments pursuant to Gull's assignment were preferential, Embraer argues that the payments are not recoverable under section 547(b) because they were made by Embraer in the ordinary course of business.

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—...

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of debtor and the transferee; and

(C) made according to ordinary business terms....

11 U.S.C. § 547(c)(2) (West 1988). Moreover, section 547(g) places the burden of proving the nonavoidability of a transfer under 547(c)(2) upon the creditor against whom the recovery or avoidance of a preference is sought. 11 U.S.C. § 547(g) (West 1988).

This Court has considered the ordinary course of business defense in a recent series of opinions. *In re Alter Hall Construction Co., Inc.,* 73 B.R. 989 (Bankr.D. Mass.1987), *aff'd,* 83 B.R. 180 (D.Mass.

---

**5.** Section 547(a)(3) provides: "'receivable' means right to payment, whether or not such right has been earned by performance...." 11 U.S.C. § 547(a)(3) (West 1988).

1988); *In re First Software Corp.*, 81 B.R. 211 (Bankr.D.Mass.1988); *In re Gull Air, Inc.*, 82 B.R. 1 (Bankr.D.Mass.1988), *aff'd*, CA No. 88–732–T (D.Mass. June 28, 1988); *In re First Software, Inc.*, 84 B.R. 278 (Bankr.D.Mass.1988).

In *In re Gull Air, Inc.* the Court, quoting from *In re First Software Corp.*, 81 B.R. at 212–13, stated:

'The purpose of the ordinary course of business exception to the trustee's power to avoid preferential transfers is "to leave undisturbed normal financial relations [of the debtor], because [they do] not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 337 (1977), *reported in* 1978 U.S.Code Cong. & Admin.News 5963, 6329. Consequently, the exception is intended to " 'encourage creditors to continue short term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it.' " *In re Southern Commodity Corp.*, 78 B.R. 626, 628 (Bankr.S.D.Fla.1987), *quoting In re Morris*, 53 B.R. 190, 192 (Bankr.D.Or.1985).

The Bankruptcy Code does not define "ordinary course of business." Accordingly, the Court must focus on the conduct of the parties involved. In other words, " 'ordinary' contemplates what is ordinary with respect to the parties." *In re Fulghum Construction Corp.*, 78 B.R. 146, 152 (Bankr.M.D.Tenn.1987). The factors the Court should consider to determine whether a transferee has established the requirements of section 547(c)(2) include: 1) the prior course of dealing between the parties; 2) amount of the payments; 3) the timing of the payments; and 4) the circumstances surrounding the payments. *In re White*, 58 B.R. 266, 269 (Bankr.E.D.Tenn.1986). Additionally, the Court should narrowly interpret section 547(c). *In re Fulghum Construction Corp.*, 78 B.R. at 152. *See, e.g. U.S. v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979);

*Brennan v. Valley Towing Co., Inc.*, 515 F.2d 100 (9th Cir.1975).'
*In re Gull Air, Inc.*, 82 B.R. at 2–3.

Embraer argues that the instant proceeding is distinguishable from *In re Gull Air, Inc.* (*Gull Air, Inc. v. Beech Acceptance Corporation, Inc.*) (the "Beech case"). Embraer correctly notes that in the Beech case, the Court held that transfers pursuant to a workout agreement did not constitute payments in the ordinary course of business because they were in response to a civil action and were not consistent with the prior transactions between the parties since an additional sum was required for the payment of arrearages and payments were made directly from Gull's airline clearing house account. Embraer stresses that its assignment did not involve a lawsuit or provide for arrearage payments in addition to amounts currently owed. It adds that the two $50,000 payments were applied to periodic charges and rental fees consistent with Gull's practice of issuing one check or wire transfer to pay several Embraer invoices at once. Embraer also points out that amounts of the payments were not unusual and that Gull made three other wire transfers to Embraer in 1986: $50,000 on May 8, 1986, $150,000 on May 20, 1986, and $112,449.15 on December 2, 1986. Finally, Embraer argues that the average number of days between invoice date and payment days in 1986 was raised to 60 days from 57.9 days by the inclusion of the two $50,000 payments. Thus, Embraer views the payments Gull made pursuant to the assignment as merely facilitating the payment of Gull's ongoing obligations.

Gull, on the other hand, maintains that the payments in question simply were not made in the ordinary course of business between the parties since they were inconsistent with prior transactions. It relies on the fact that none of the prior transfers between the parties were ever made directly from the ACH and that the prior wire transfers, which were not made from Gull's clearing house account, were themselves extraordinary. For example, Gull states the May 1986 wire transfer covered a dishonored check and the December 2, 1986 transfer was made to avert repossession of

the aircraft by Embraer. Gull also emphasizes the change from regular payments to payments from the ACH account in response to Embraer's collection efforts, citing the change from ordinary checks to cashiers' checks in response to the creditor's concern over the Debtor's ability to pay in *Matter of Craig Oil Co.*, 31 B.R. 402 (Bankr.M.D.Ga.1983), *aff'd*, 785 F.2d 1563 (11th Cir.1986).

The Court agrees with Gull Air's analysis and, therefore, is unable to find that Embraer has proved the payments from Gull's ACH account fall within the ordinary course of business exception. The payments simply were not consistent with prior transactions between the parties. Accordingly, the Court enters judgment in favor of Gull and against Embraer in the amount of $100,000.