In re SOUTHERN COMMODITY
CORP., Debtor.

SOUTHERN COMMODITY CORPORA-
TION OFFICIAL LIQUIDATING
COMMITTEE, Plaintiff,

v.

EL CAMPO RICE MILLING CO.,
INC., Defendant.

Bankruptcy No. 85–01103–BKC–TCB.
Adv. No. 87–0294–BKC–TCB–A.

United States Bankruptcy Court,
S.D. Florida.

Sept. 14, 1987.

Robert F. O'Malley, Jr., Miami, Fla., for plaintiff.

Weil, Gotshal & Manges, Lawrence D. Mungin, Houston, Tex., for defendant.

MEMORANDUM DECISION

THOMAS C. BRITTON, Chief Judge.

The Liquidating Committee, created by a confirmed chapter 11 plan, seeks recovery of $281,018 as a preferential transfer under 11 U.S.C. §§ 547 and 550. Defendant has answered and the matter was tried on July 30.

The facts are not in dispute. Defendant concedes that a prima facie case has been proved, but asserts four affirmative defenses: lack of standing, the statute of

limitations, new value was given, and the payments were made in the ordinary course of business. (C.P. No. 5). I conclude that the trustee is entitled to judgment against defendant for $270,323.

## STANDING

■ Section 547(b) provides that "the *trustee* may avoid" certain specified transfers. The term is not specifically defined in the Code, but it clearly includes those persons appointed under §§ 701, 702, 703, 1104, 1163, or 1302, as well as a chapter 11 debtor who:

"shall have all the rights ... and powers ... of a trustee". § 1107(a).

By its Answer, defendant concedes that: "Pursuant to the Debtor's confirmed Plan of Reorganization, the Liquidating Committee is the holder of all Debtor's rights and interests in property as described therein, including, but not limited to, all causes of action of the Debtor." Complaint ¶ 2.

However, defendant challenges the plaintiff committee's standing to bring this action.

Plaintiff does not fall literally within the eligibility standards specified in § 321(a):

"A person may serve as trustee in a case under this title only if such person is (1) an *individual* that is competent to perform the duties of trustee ... or (2) a *corporation* authorized ... to act as trustee."

Creditors are entitled to elect a trustee under § 702(b), which provides that they "may elect *one person* to serve as trustee".

Though plaintiff is clearly neither an "individual" nor a "corporation", I believe it falls within the "one person" (which the creditors may elect), as that term is defined in § 101(35):

" 'person' *includes* individual, *partnership*, and corporation".

There is no plausible reason to presume a legislative intent to exclude a committee, which would otherwise be competent to perform a trustee's duties. It has not been suggested that this committee is not competent or has a conflict of interest.

Section 1123(b)(3)(B) explicitly provides that a plan may:

"provide for ... (B) the retention and enforcement ... *by a representative of the estate* appointed for such purpose, [settlement or adjustment of any claim or interest belonging to the debtor or to the estate]".

This plan did so and designated the plaintiff committee as the representative of the estate. *In re Chase & Sanborn Corp.,* 813 F.2d 1177, 1180 n. 1 (11th Cir.1987), held that the appointment in a chapter 11 plan of a "liquidating trustee" for the recovery of preferential and fraudulent claims was valid and upheld his standing to sue for the recovery of such transfers. I find no rational basis to reach a contrary conclusion with respect to the standing of this "liquidating committee".

## STATUTE OF LIMITATIONS

Defendant pleads that this claim is barred by § 546(a), but has made no reference to this defense in its two memoranda. No trustee was ever appointed and this complaint was filed less than two years after the plan was confirmed. (C.P. No. 203). *See generally* 4 *Collier on Bankruptcy* (15th Ed.) ¶ 546.02[2]. I will presume this defense has been abandoned.

## NEW VALUE

■ Defendant has claimed and plaintiff concedes that defendant delivered 700 bales of rice worth $10,695 following one of the payments in question here and is, therefore, entitled under § 547(c)(4) to a credit in that amount as "new value". I agree.

## PAYMENT IN ORDINARY COURSE AND TERMS

Plaintiff cannot avoid a transfer:

"to the extent that such transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of

the debtor and the transferee; and (C) made according to ordinary business terms." § 547(c)(2).

The parties had been doing business with one another for three years, and plaintiff concedes that the *debt* to defendant was incurred in the ordinary course of the existing business relationship between the parties. Plaintiff denies, however, that the *payments* were made in the ordinary course of their business and that they were made according to ordinary business *terms*, elements (B) and (C) in the statutory defense.

Six payments for shipments of rice totalling $281,018 were made by the debtor to defendant during the three months between February 19 and May 20, 1985. The payments were for invoices dated from October 31, 1984 to January 18, 1985. The invoices totalled $395,178. There had been no payments upon the debtor's account during the three months preceding February 19, back to November 23, 1984. The debtor filed for bankruptcy May 20, 1985, four months after the last payment. It then still owed defendant over $120,000.

During the three years' previous dealings between the parties, before these payments, there had been 76 payments for 131 transactions. The average interval during these past dealings between invoice and payment was 36 days and the longest was 50 days.

The six payments during the preference period averaged 99 days and the *shortest* was 55 days. Only one was made that soon. The remaining five were at least 72 days after the invoice. In short, not one of these challenged payments was made as promptly as the slowest payment made during the preceding three years.

Defendant admits it knew in January 1985, that the debtor was in financial trouble. It had then received no payments for two months. Defendant's agent was prompted to call on the debtor, for the first time in two years. Defendant suspended its deliveries to the debtor. Despite defendant's contrary explanation, I believe it did so because of the debtor's delinquent account and perilous situation. The debtor

acknowledged its account was past due and promised a "rapid pay down" by a letter dated February 12. The last two payments, March 29 and April 5, were in the lump sum of $30,000 each, unrelated to any specific invoice. These two payments were obviously not in the regular course of business. I believe the other four payments also were not in the regular course of business.

◼ The ordinary business terms in this industry are either net ten or 30 days, depending upon whether the shipment is packaged or bulk. The debtor received both. The debtor's payments were rarely made according to these ordinary terms throughout its relationship with defendant. Section 547(c)(2)(C) requires that payments be made according to terms ordinary in the *industry* not in the prior dealings of the parties.

The purpose of the ordinary course of business exception, as reflected in the legislative history:

"is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy." Quoted in *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir.1986).

The exception was, therefore, intended to:

"encourage creditors to continue short-term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it." *Morrow v. U.S. (In re Morris)*, 53 B.R. 190, 192 (Bankr. Or.1985).

The applicability of the exception requires consideration of all the circumstances of the payments, but:

"Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception. As several courts have noted, this exception is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle. It was for

this reason that Congress originally required payment within forty-five days of incurring the obligation. This period represents a normal trade cycle." *In re Craig Oil, supra,* at 1567 n. 8.

The Court also noted as significant that payments were made after deliveries had ceased, as was the case here. *Id.* at 1567.

I find that defendant has failed to carry its burden under § 547(g) of proving either that these six payments were made in the ordinary course of business of the parties or according to ordinary business terms.

As is required by B.R. 9021(a), a separate judgment will be entered for the plaintiff against defendant in the amount of $270,-323, which reflects the credit of $10,695 to which defendant is entitled. Costs may be taxed on motion. Of course, this does not mean defendant is denied payment for its goods, merely that it must share this estate pro rata with the other unsecured creditors.