**In re KROH BROTHERS DEVELOP-MENT COMPANY, a Missouri Corporation, Debtor.**

**In re KROH BROTHERS EQUITY COMPANY, a Missouri Corporation, Debtor.**

**In re KROH BROTHERS REALTY COMPANY, a Missouri Corporation, Debtor.**

**In re KROH INVESTMENTS I, INC., a Missouri Corporation, Debtor.**

**In re KROH TELECOMMUNITIES, INC., a Missouri Corporation, Debtor.**

**In re WARD PARKWAY CORP., a Missouri Corporation, Debtor.**

**KROH BROTHERS DEVELOPMENT COMPANY and The Kroh Operating Limited Partnership, By I.I. Ozar, Managing Agent and Estate Administrator, Plaintiffs,**

v.

**UNITED MISSOURI BANK OF KANSAS CITY, N.A., Defendant.**

Bankruptcy Nos. 87–00640–1–11, 87–01265–1–11, 87–00641–1–11, 87–01263–1–11, 87–01930–1–11 and 87–01266–1–11. Adv. No. 89–4035–1–11.

United States Bankruptcy Court, W.D. Missouri, W.D.

April 27, 1989.

Appeal Denied July 31, 1989.*

---

* See 101 B.R. 1000.

**488**

See also, Bkrtcy., 91 B.R. 889.

Cory Lipoff, Nachman, Munitz, Sweig, Ltd., Chicago, Ill., for debtors.

R. Pete Smith, McDowell, Rice & Smith, Kansas City, Kan., for Ozar.

Edward E. Schmitt, Dietrich, Davis, Dicus, Rowlands, Schmitt & Gorman, Kansas City, Mo., for Segregated Fund trustee.

Thomas S. Kiriakos, Mayer, Brown & Platt, Chicago, Ill., for Creditors Committee.

Mendel Small, Scott Goldstein, Spencer, Fane, Britt & Browne, Thomas M. Deacy, Gary Cupples, Deacy & Deacy, Kansas City, Mo., for United Missouri Bank of Kansas City.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF STANDING AND DENYING MOTION FOR STAY OF PROCEEDINGS

KAREN M. SEE, Bankruptcy Judge.

Debtors and I.I. Ozar (collectively, plaintiffs) sued defendant United Missouri Bank of Kansas City, N.A. seeking to avoid various allegedly preferential transfers. In addition to this proceeding, Debtors and either Ozar or the Segregated Fund Trustee, Edward E. Schmitt[1] filed approximately 88 other adversary proceedings seeking recovery of either preferential transfers or fraudulent conveyances. Pending before the Court is defendant's Motion to Dismiss for Lack of Standing.[2] In its Motion and Suggestions in Support defendant argues that plaintiffs lack standing to bring this adversary proceeding and the complaint should be dismissed. Defendant bases its argument on the premise that the avoiding powers have been improperly assigned or transferred to plaintiffs because only a trustee or debtor in possession have au-

---

1. Mr. Schmitt is the trustee under the Segregated Fund created by Debtors' Plan. *See discussion, infra* at p. 491.

2. Defendant's Motion to Dismiss for Lack of Standing alternatively contends that Count III of the complaint fails to state a claim upon which relief can be granted and should be dismissed pursuant Fed.R.Civ.P. 12(b)(6) and Bankruptcy Rule 7012. Count III is premised on an "expanded preference" theory. That issue is not discussed in this opinion.

thority to use those powers. Other defendants in similar adversary proceedings (Adversary Proceedings) also filed Motions to Dismiss asserting plaintiffs' lack of standing.

Plaintiffs' responsive briefs were timely filed. The Creditors' Committee Panel created pursuant to the Plan[3] filed its Memorandum pursuant to 11 U.S.C. § 1109(b) in opposition to the Motion. Decretal Paragraph 24 of the Confirmation Order[4] provides that the bankruptcy court shall retain jurisdiction over the Debtors' Chapter 11 cases in accordance with Article 13 of the Plan.[5]

An evidentiary hearing was held on April 19, 1989. At the hearing plaintiffs produced testimony from three witnesses: Greg Galvin, Jim Harpool and Patrick Healy.

Galvin worked for Kroh Brothers Development Company (KBDC) prepetition from September, 1986 until the date of the bankruptcy filings on February 13, 1987. During that period he had accounting and cash management responsibilities. On the date of filing he was the assistant controller but soon thereafter became the controller. During the bankruptcy proceedings, he supervised the assembly of monthly operating reports filed with this Court, had supervision and control of cash management and made cash projections of the Kroh Related Entities.[6] Since confirmation of the Plan, Galvin has been employed by the Kroh Operating Limited Partnership created by the Plan[7] and is its Chief Operating Officer. In that capacity, he serves as the primary KOLP contact for attorneys and is responsible for cash management, cash projections, and tax filings. He meets on a regular basis with the Ozar Partnership and has participated in every meeting involving either the analysis of a potential claim against a creditor or settlement negotiations with the creditor prior to filing suit.

Jim Harpool also worked for KBDC prior to the bankruptcy. At the time of filing, he worked with KBDC's development and construction activities. He is currently employed by KOLP and is in charge of day-to-day operations of the KOLP properties.

Patrick Healy represents creditor Equity Analysts. Prior to bankruptcy he had business dealings with KBDC. During bankruptcy, he presided over the Creditors' Committee and was involved with pre-confirmation negotiations with Ozar. He is currently on the Creditors' Committee Panel (Panel).

The Court found the testimony of all witnesses highly credible.

## FINDINGS OF FACT

From February 13, 1987 through May 1, 1987 KBDC and its five affiliated corporations (Debtor plaintiffs herein) as well as more than thirty related partnerships (collectively the Kroh Related Entities) filed voluntary petitions under Chapter 11. Due to the magnitude of the bankruptcy proceedings and the dispositive nature of the standing issue, a review of the history of Debtors and these proceedings is necessary.

*Prebankruptcy History*

Unless otherwise noted, the following discussion of facts is taken from the Disclo-

---

3. "Second Amended Joint Plan of Reorganization Proposed by the Debtors and the Ozar Partnership as Modified," Doc. No. 1289 in *In re Kroh Brothers Development Company,* Case No. 87–00640–1–11 (2/11/88) and as modified by the "Order Granting Motion to Modify Plan," Doc. No. 1359 in *In re Kroh Brothers Development Company,* Case No. 87–00640–1–11 (3/8/88). Both parties admitted a copy of the Plan into evidence at the hearing. *See* Plaintiffs' Exhibit D; Defendant's Exhibits 2, 5.

4. "Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Plan of Reorganization Proposed by the Debtors and the Ozar Partnership as Modified," Doc. No. 1361 in *In re Kroh Brothers Development Company,* 87–00640–1–11 (3/8/88).

5. The retention of jurisdiction provision in the Plan was recently upheld. *See TMS Associates v. Kroh Brothers Development Co.,* 100 B.R. 480 (W.D.Mo.1989) (Wright, C.J.).

6. *See infra* at p. 489.

7. *See infra,* discussion at p. 490–491.

sure Statement [8] and plaintiffs' undisputed statements of fact. The Debtors were in the real estate development business prior to commencement of these bankruptcy cases. They had substantial commercial real estate holdings and acquired property with a view towards syndicating interests in partnerships that would eventually own such property. For various reasons the Debtors' business operations disintegrated. Beginning in mid-November, 1986, numerous transfers were made by the Debtors of their real property interests and their partnership interests (including 55 partnership interests belonging to KBDC) to various lenders, limited partners in the partnerships, and other third persons. By the end of January, 1987, it became clear that Debtors would not be able to reach a consensual arrangement with its creditors.

*Proceedings During Bankruptcy*

Debtors operated as debtors in possession during the pendency of these cases. An Official Unsecured Creditors' Committee (Creditors' Committee) was also appointed in the then-pending Kroh Related Entities' bankruptcies pursuant to the Court's Order entered on March 5, 1987. Healy testified that it soon became clear Debtors could not reorganize. Both Galvin's and Healy's testimony indicated that the number of real estate interests and debts encompassed by the bankruptcy filings required the assistance of a third party with substantial financial capability and familiarity with both local and national real estate markets to formulate and implement a plan of reorganization with the greatest potential return to creditors. Accordingly, both Debtors and the Creditors' Committee actively solicited more than 100 third parties to assist them in formulating a plan or plans of reorganization.

As a result of these solicitations Debtors entered into preliminary negotiations with a number of nationally known real estate developers. After much consideration Debtors reached an agreement with I.I. Ozar to work toward the formulation of a plan. This acceptance took the form of the execution of a letter agreement that was subject to bankruptcy court approval. Ozar and his two partners Frank Morgan and Sherman Dreiseszun are well known in Missouri and elsewhere as real estate developers with extensive holdings and as bankers.

This Court entered its Order and Judgment approving an agreement with Ozar or his assigns on September 9, 1987.[9] The Court concluded in its Order that the assistance of a third party with substantial financial capability was required to formulate a plan of reorganization in these cases. The Court further concluded that Ozar was familiar with the local and national real estate markets, had extensive experience in real estate financing and was well suited to assist Debtors and their affiliated partnerships in these cases. Ozar, Frank Morgan and Sherman W. Dreiseszun formed the partnership in October, 1987 that eventually became known as the Ozar Limited Partnership for the purpose of jointly proposing a plan with the Debtors. Galvin testified the Plan was the result of substantial negotiations by and among Debtors, the Ozar Partnership and the Creditors' Committee.

*Plan Terms and Confirmation*

Debtors and the Ozar Partnership filed their original joint plan of reorganization on October 8, 1987. The final version, which became the Plan after approval of the disclosure statement and confirmation

---

**8.** "Second Amended Joint Disclosure Statement of Debtors and Ozar Partnership Pursuant to Section 1125 of the Bankruptcy Code, Dated January 11, 1988," Doc. No. 1198 in *In re Kroh Brothers Development Company*, 87–00640–1–11. The Disclosure Statement was approved by Order of this Court entered January 14, 1988, Doc. No. 1205 in *In re Kroh Brothers Development Company*. Both parties admitted a copy of the Disclosure Statement into evidence at the hearing. *See* Plaintiffs' Exhibit E; Defendant's Exhibit 1.

**9.** *See* "Findings of Fact and Conclusions of Law Regarding Application of Debtors and the Committee for Authority to Enter into Letter Agreement with I.I. Ozar, "Doc. No. 88 in *In re Kroh Brothers Entities*, Case No. 87–99999, (9/9/87) and "Order and Judgment Granting Application of Debtors and Committee for Authority to Enter into Letter Agreement with I.I. Ozar," Doc. No. 89, *In re Kroh Brothers Entities*, Case No. 87–99999, 9/9/87).

proceedings, was filed February 11, 1988. The original disclosure statement was filed on October 22, 1987. Two subsequent versions of the disclosure statement were filed. Each disclosure statement was properly noticed and heard and the Disclosure Statement was approved by this Court's Order entered January 14, 1987.

The Plan contemplated the formation of the Kroh Operating Limited Partnership (KOLP) to be comprised of Debtors and the Ozar Partnership. Both Debtors and the Ozar Partnership were to have a 50% interest in KOLP. The Plan then divided the estate's assets into four categories: Cash, Causes of Action, Designated Trust Assets and Remaining Assets. The Debtors would transfer the Causes of Action and the Remaining Assets to KOLP in return for a 50% partnership interest in KOLP. In consideration for its partnership interest, the Ozar Partnership would contribute capital and obligate itself to loan funds and perform tasks as necessary to accomplish the operation of the business of KOLP as set forth in the Plan.

The Plan also created a Segregated Fund for the purpose of administering payments of allowed claims in accordance with the terms of the Plan. A Segregated Fund Trustee with powers equivalent to a trustee under the Bankruptcy Code would be appointed. The Segregated Fund would receive Cash and the Designated Trust Assets on the effective date. Thereafter, the fund would receive the proceeds of the liquidation of a number of other assets. Thus, the bankruptcy estate would receive all of the Designated Trust Assets, the first $1,000,000 generated from the other assets and 50% of the balance. The Ozar Partnership would receive the other 50% of the value of the other assets.

The Causes of Action are defined in each plan as "all ... claims and causes of action of any kind, whether legal or equitable, of the Debtors for affirmative recovery of Cash or other property of the estate...." Each version of the disclosure statement states, in Article V.F, and each version of

the plan provides, in Section 8.5, that an entity defined by the plan "shall succeed to all of the rights, powers and duties of a trustee under the Bankruptcy Code including, without limitation, the right to ... prosecute, compromise or settle the Causes of Action." Under the Plan, that entity is the Managing Agent. Each version of the plan contemplated that either Mr. Ozar, Mr. Morgan, or Mr. Dreiseszun would be one of three persons serving in that capacity. Additionally, each version of the Plan and Disclosure Statement contemplated the formation of a partnerhsip comprised 50% of Debtors and 50% of the Ozar Partnership.

Plaintiffs' Exhibit I is a copy of the Declaration of Gregory M. Galvin dated February 11, 1988.[10] It was submitted in support of confirmation of the Plan and admitted into evidence at the hearing. According to the Declaration the unsecured creditors, Class 6 under the Plan, voted overwhelmingly in support of the Plan. Of the votes cast, over 267 representing 89% in number of claims and $189,215,040.42 representing 82% of amount of claims voted to accept the Plan. If the contingent claim of one creditor, Chemical Bank, had not been included, the creditors voting to accept the Plan would have been over 95%.

After circulation of the Disclosure Statement, voting, notice, and an evidentiary hearing, this Court entered the Confirmation Order. The Confirmation Order provides, at ¶ Q:

> The Managing Agent ... shall have all the duties and powers provided in or contemplated by the Plan including, specifically, without limitation, ... the powers of a bankruptcy trustee to avoid transfers under and pursuant to Sections 545, 547–551, and 553, which powers are contemplated pursuant to Section 1123(b)(3)(B) to be exercised by them in their status as representatives of the estates appointed for the purpose of enforcing the claims (including the Causes of Action) retained pursuant to the Plan.

---

**10.** "Declaration of Gregory M. Galvin Re Acceptances and Rejections to Second Amended Joint Plan of Reorganization Dated December 29, 1987," dated February 11, 1988.

In the Confirmation Order this Court additionally found that the Plan complied with all provisions of § 1129 including the "best interests" test of § 1129(a)(7). The Court's determination of best interests rested upon the estimate of the value relinquished by creditors under the participation allotted by the Plan to the Ozar Limited Partnership, compared to the estimated enhanced value the Ozar Partnership would add to the distribution to general unsecured creditors through the use of the Ozar Partnership loans and expertise. Confirmation Order at p. 15–21. Therefore, the Court determined that creditors would receive more under the Plan than they would receive under Chapter 7 of the Bankruptcy Code. *Id.* No appeal was taken from the Confirmation Order.

*Post–Confirmation*

The following discussion relates only a portion of the voluminous evidence adduced by plaintiffs that the Plan is being consummated as contemplated. The transcript should be consulted for a complete recitation of the evidence. Galvin's direct testimony and Plaintiffs' Exhibits K, L, M, N and O were particularly persuasive. Exhibit K, as testified to by Galvin, reflects the results of negotiations between the Ozar Partnership and the limited partners of 15 limited partnerships in which Debtors had, either prepetition or during bankruptcy, an ownership interest. Exhibit K and Galvin's testimony show that, in all but one instance, Debtors' ownership interest increase 1 dramatically through recovery of partnership interests which were transferred prepetition in order to unload properties and ease cash flow problems prior to bankruptcy. In one instance, the Ozar Partnership negotiated a decrease in the balance on the second mortgage. The total equity to KOLP resulting from these negotiations is $6,489,000. Exhibit K.

Two of the properties currently owned 100% by KOLP were not owned by KOLP at the time of confirmation. Ozar Partnership negotiations resulted in recovery of 100% ownership. In one instance relating to property at 9200 Ward Parkway, the limited partners not only gave back the property, they also paid an additional $62,500 at the time of the transaction. The total equity to KOLP from all the 100% owned properties is currently $5,175,000. Exhibit M.

Additionally, the Ozar Partnership has successfully refinanced $21,134,000 of first or second mortgages on seven of the above-mentioned properties. Exhibit N. Refinancing is pending and expected to close on three other properties whose first or second mortgages total $11,550,000. Exhibit N. Galvin testified that in each case the refinancing resulted in a reduced interest rate and that in many instances circumstances necessitated that the refinancing occur within a brief period of time. In Galvin's opinion, only a group with the Ozar Partnership's expertise and financial resources and contacts could have accomplished the refinancings in such short order.

Galvin also testified that the Ozar Partnership had negotiated cash settlements in the aggregate amount of $3,236,786.26 and settlements involving promissory notes in the aggregate amount of $2,178,000. Exhibit L. He further testified that, through negotiations between the Ozar Partnership and the relevant creditors, 75 claims in the aggregate amount of $50,476,995.11 have been released, 57 claims in the aggregate amount of $78,445,038.06 have been compromised and 19 claims in the aggregate amount of $25,731,033.53 have been settled for a total reduction of claims of more than $154,000,000. Exhibit O. This substantial reduction of claims serves to increase the pool of distribution for remaining creditors.

In one instance the claimant, Angelo Mariani, offered to add $1,000,000 in cash to the settlement terms provided he could keep his claims against the estate of between $17,000,000 and $20,000,000. KOLP had determined Mariani was entitled to claims for that amount. However, KOLP maintained its position that claims would be either reduced or waived at the time of settlement. The result was that Mariani's claims were reduced to $1,000,000. The Ozar Partnership's position was that it was unfair to the unsecured creditors to take

cash, even though it would benefit the Ozar Partnership, whereas a reduction of claims would benefit only the creditors and not the Partnership.

In another instance, the Ozar Partnership negotiated a settlement with Equity Partnerships Corporation in which KOLP received the general partnership interest, a $600,000 promissory note and the reduction of 50 claims, each at $3,800,000 to a single claim of $1,900,000.

Galvin's testimony also revealed that, under Ozar Partnership management, the net monthly operating loss has been reduced by as much as $70,000. This is due primarily to the manner in which Ozar personally handles requisitions and payments, and the fact that the Ozar Partnership has vendor contacts across the country and obtains bids on all items necessary to maintain the various properties.

Finally, Galvin testified to a number of incidents, in addition to the refinancings, where without the Ozar Partnership no negotiations would have taken place. In many instances involving limited partnerships, the limited partners were skeptical of dealing with Debtors. However, the Ozar Partnership's singular expertise and reputation in matters of real estate management and finance seemed to smooth the path and open the door to negotiations, some of the fruits of which are detailed above.

Patrick Healy, head of the Creditors' Committee and member of the post-confirmation creditors' Panel, also testified that but for the presence of the Ozar Partnership, Equity Analysts would have been hesitant to deal with Debtors. Thirteen properties in which Debtors had an interest were transferred to Equity Analysts prepetition and, upon demand from Ozar and KOLP, several were returned or were the subject of settlement post-confirmation.

From this testimony the Court finds that the benefit of the Ozar Partnership to the estate, as evidenced by the above examples of transactions and procedures, is clear. The release, compromise and settlement of more than $154,000,000 in claims decreases the pool of unsecured creditors to be paid.

This, in turn, increases the return to the remaining unsecured creditors. The refinancings and Ozar's oversight of expenses decrease operating expenses and assist with cash flow and the properties' profitability. This serves to increase the properties' marketability. The increase in KOLP ownership interests in various properties also serves to create operating income for KOLP during the post-confirmation, property enhancement period.

*Role of the Managing Agent*

Although the Plan contemplates and the Confirmation Order provides that the Managing Agent shall succeed to all the rights, powers and duties of a trustee under the Bankruptcy Code, that authority is not unfettered. The Plan also created the Panel comprised of three primary and three alternate members chosen by the Creditors' Committee. Under the Plan the Panel is entitled to at least 14 days notice of the terms and conditions of any proposed disposition of an asset, including any proposed disposition consisting of a decision to settle or not to pursue a Cause of Action. If the Panel votes not to approve a proposed disposition, the matter is submitted to arbitration binding on the Managing Agent and the Panel.

The Plan also provides for procedures with respect to causes of action involving Ozar or an Ozar Affiliate. In those instances the Segregated Fund Trustee would pursue the Cause of Action as a representative of the estate. The Plan further provides for procedures designed to permit the Panel to determine whether any of the general partners of the Ozar Partnership have a conflict of interest with respect to a proposed asset disposition. Any conflict would be handled by the Segregated Fund Trustee.

Healy testified that the Panel meets periodically with the Ozar Partnership, Galvin, Harpool and Mr. Schmitt, who is the Segregated Fund Trustee, to review proposed transactions. Any information requested by the Panel is supplied by Galvin. In Healy's opinion, the Panel was operating as anticipated in the Plan.

It is noted that in closing argument defendant agreed that KOLP and Ozar had done a very good job to date in collecting assets for the estate.

## CONCLUSIONS OF LAW

*Standing Issue*

■ The burden of proof is on the party whose standing is questioned. *Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857[6] (10th Cir.1986).

The main thrust of defendant's argument is simple and plainly stated at page five of its Suggestions: "The overwhelming weight of authority holds that the avoiding powers belong exclusively to the trustee in bankruptcy and the debtor in possession and may not be transferred or assigned in any type of bankruptcy proceeding, whether pursuant to a Plan or whether to an individual liquidator, creditor or creditors' committee." Defendant further asserts that the facts of this case fit squarely within the existing precedent and therefore no exception should be made in this case. In support of these contentions, defendant argues that KOLP and the Managing Agent are strangers to the estate because they are neither trustees, debtors in possession, a creditor or creditor's committee. Rather, defendant contends the avoiding powers are vested in a "liquidator" who receives 50% of everything it collects and who has no fiduciary duties to anyone. Defendant argues that if a trustee or debtor in possession exercises the avoiding powers, the creditors receive 100% of the fruits of debtor's litigation.

Plaintiffs argue that the avoidance actions were not assigned but were retained, that plaintiffs are the properly appointed "representatives of the estate" within the purview of § 1123(b)(3)(B) and are acting in the best interests of the estate and the creditors. Therefore, plaintiffs contend they have standing to pursue these actions.

Under § 1123(b)(3)(B) a plan may provide for the "retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim or interest belonging to the debtor or to the estate. In *DuVoisin v.*

*East Tennessee Equity, Ltd. (In re Southern Industrial Banking Corporation,* 59 B.R. 638, 642 (Bankr.E.D.Tenn.1986), Judge Clive Bare analyzed the legislative history of the predecessor to § 1123(b)(3)(B), 11 U.S.C. § 616(13) (West 1970) (repealed). This Court agrees with and adopts the following analysis of the legislative history and the legislative intent behind any change in the statutory language:

The legislative history of [§ 616(13)] made clear that its aim was to make possible the formulation and consummation of a plan before completion of the investigation and prosecution of causes of action such as those for previous insider misconduct and mismanagement of the debtor. Thus, the statute was in furtherance of the purpose of preserving all assets of the estate while facilitating confirmation of a plan. (citations omitted).

If a plan fixing treatment of and distribution to creditors may be so formulated and confirmed prior to the recovery of such claims, this court fails to see why the same should not be true with regard to the preservation and retention of the claims here in issue. This court notes that § 1123(b) now provides for the retention and enforcement of claims by the *debtor* as well as by a trustee or representative of the estate. (Former § 616(13) merely provided for retention and enforcement by the trustee or an examiner appointed for the purpose.) Also significantly, § 1123(b) has added the word 'any,' thus providing now for the retention and enforcement of '*any* such claim or interest.' (emphasis supplied). Both these changes indicate, if anything, a legislative intention to liberalize, rather than to constrict, the scope of the provision."

The key point should be obvious —§ 1123(b) so applied does not here redound to the isolated or exclusive benefit of the reorganized entity but will clearly result in the receipt of augmented value by those parties intended to be the beneficiaries of distribution under the plan.
59 B.R. at 642.

Only two of the cases cited by defendant considered whether the circumstances

therein involved the retention and enforcement of claims and interests of the debtor or estate within the meaning of § 1123(b)(3)(B). In *Foster Development Co. v. Morning Treat Coffee Co. (In re Morning Treat Coffee Co.)*, 77 B.R. 62 (Bankr.M.D.La.1987) the court stated, in *dicta,* several reasons why § 1123(b)(3)(B) might not allow for the retention of avoidance powers. The court opined that the term "claim" as used in § 1123(b)(3)(B) "*arguably* does not include the trustee's power to avoid the transfer of an interest since the term 'claim' refers to a right to payment" and an avoidance power is not a right to payment. 77 B.R. at 65. The court also stated that § 1123(a)(3) "*arguably* does not apply to a § 544 avoidance action because the action does not belong to the estate but rather is a right of creditors exercisable by the trustee." 77 B.R. at 65.

■ This Court is not bound by *dicta* and further concludes there are more persuasive reasons to find that both avoidance actions and the concomitant avoidance powers are within the purview of § 1123(b)(3)(B). Bankruptcy courts have been charged with the prompt and efficient judicial management of bankruptcy proceedings. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, 373 (5th Cir.1987) (en banc), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The primary purpose of bankruptcy proceedings is to "secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *TMS Associates v. Kroh Brothers Development Company,* 100 B.R. 480, 486 (W.D.Mo. 1989). To construe § 1123(b)(3)(B) as prohibiting the retention of avoidance actions would force the trustee or debtor in possession to bring all avoidance actions pre-confirmation. Such an interpretation does not make good business sense and is not necessary, *see e.g., TSM Associates,* 100 B.R. at 486 n. 7, because it would lengthen the time required for confirmation of a plan of reorganization, possibly to the extent that no plan could be confirmed. The section therefore must be read to include the reten-

tion of avoidance actions as claims or interests of the debtor or the estate. Because this Court concludes that retention and enforcement of claims and interests is the only reasonable interpretation, retention of the power to enforce such claims and interests should also be allowed. Accordingly, this Court holds that both avoidance actions and the avoiding powers necessary to enforce those actions are within the purview of claims and interests that may be retained pursuant to § 1123(b)(3)(B).

The second decision relied on by defendant in which a court considered § 1123(b)(3)(B) is *In re Sweetwater,* 55 B.R. 724 (D.Utah 1985). The plaintiff in *Sweetwater* was the trustee for a discrete group of creditors, who were administrative expense claimants. These claimants had been assigned debtor's avoidance causes of action against two creditors, defendants in the adversary proceeding, because debtor could not pay them on the effective date of the plan as required by § 1129(a)(9)(A) and without the agreement no plan could be confirmed. 55 B.R. at 725. The agreement between the claimants and debtor provided that certain claims would be fully paid and the remaining claims would be paid from potential proceeds of litigation against defendants. 55 B.R. at 725–26. It vested title to the assets in the trustee providing that the causes of action against defendants remain with debtor " 'insofar as necessary to preserve the causes of action.' " 55 B.R. at 726. The district court assumed that the agreement became part of debtor's confirmed plan. *Id.*

In considering § 1123(b)(3) the court focused on the term "representative of the estate." The court found that, even assuming the term included a debtor in possession's assignee, "it would be contrary to the spirit of chapter 11 to hold that the 'appointment' of the representative could be by a unilateral declaration of the debtor in possession." 55 B.R. at 730. Rather, such appointment should be made by the bankruptcy court. *Id.* Thus, the court interpreted the term "representative of the

estate" to mean a representative appointed by the bankruptcy court. *Id.*

Since *Sweetwater*, a number of courts have considered whether various entities and persons are "representatives of the estate" within the meaning of § 1123(b)(3)(B). In *Nordberg v. Sanchez (In re Chase & Sanborn)*, 813 F.2d 1177 (11th Cir.1987) the defendant creditor argued that the creditor trustee in that case did not have standing to assert an action pursuant to § 548 because he was neither a trustee nor debtor in possession and the bankruptcy court had not "appointed" him. 813 F.2d at p. 1180 n. 1. The Eleventh Circuit first noted that the bankruptcy court permitted the creditor trustee to assert the claim pursuant to that court's authority under § 1123(b)(3)(B) to appoint a "representative of the estate" to enforce any claim or interest. *Id.* In rejecting defendant's argument that the creditor trustee had not been appointed, the court held:

> Although the court did not formally and specifically appoint the creditor trustee to enforce the claims, the reorganization plan approved by the court recognized that the creditor trustee would have the responsibility of pursuing claims of the debtor. The court's approval of a plan granting this authority to the creditor trustee was sufficient, under the Bankruptcy Code, to confer on the creditor trustee standing to assert this claim.

*Id.*[1].

In *Southern Commodity Corporation Official Liquidating Committee v. El Campo Rice Milling Co., Inc. (In re Southern Commodity Corp.)*, 78 B.R. 626 (Bankr.S.D.Fla.1987) the plan of reorganization provided that a liquidating committee would hold all debtor's rights and interests in causes of actions. 78 B.R. at 627. The liquidating committee sued defendant for recovery of a preferential transfer and defendant attacked the committee's standing. The court found that the plan provided for the committee's retention and enforcement of claims and interests of the debtor or estate. *Id.* Because it found "no rational basis to reach a contrary conclu-

sion with respect to the standing of this 'liquidating committee,' the court held, relying on *Chase & Sanborn*, that the liquidating committee had standing to sue. *Id.*

In *Perlstein v. Saltzstein (In re AOV Industries, Inc.)*, 62 B.R. 968 (Bankr.D.C. 1986), the confirmed plan provided for a disbursing agent to collect and distribute monies paid to him. The debtors were to assign their § 547 and § 548 avoidance powers to the agent upon confirmation. Although the standing issue was not raised, the court noted that it had previously determined that § 1123(b)(3)(B) provided authority for the agent to serve as a "representative of the estate." 62 B.R. at p. 970 n. 1.

In *Amarex, Inc. v. Marathon Oil Co. (In re Amarex)*, 88 B.R. 362 (W.D.Okla.1988), debtor filed pre-confirmation adversary actions to recover allegedly preferential transfers made to certain creditors. The plan in that case contemplated merger of the debtor into a Reorganized Amarex and "preserved and retained for enforcement" all preference claims instituted by Amarex. 88 B.R. at 363. The merger was completed and debtor became Temex. The merger was recognized and approved by the court and Temex began prosecuting the adversary proceedings. *Id.*

In concluding that Temex had standing to maintain the adversary actions, the court noted that under the Act such actions could only be pursued by a trustee or court appointed examiner. However, the Code, under § 1123(b)(3)(B), allowed retention and enforcement by the debtor, trustee or representative of the estate appointed for such purpose. The defendants argued that Temex was never appointed a representative and the retention of the actions in the Plan did not rise to the level of an appointment. The court held that certain court Orders judicially recognizing and approving the merger, Temex's existence and stating that Temex was vested with the property rights of debtor "clearly indicate that Temex should be permitted to pursue these adversary proceedings and to require a more formal judicial appointment would be to exalt form over substance." *Id.* The court

distinguished *Sweetwater* on the grounds that Temex was not a "stranger" to the proceedings: "[I]t is the entity which has evolved from the reorganization process and which is merely continuing prosecution of actions initiated by Amarex, the resulting benefits of which will redound in part to the unsecured creditors." 88 B.R. at 364. This Court finds the *Amarex* decision to be particularly on point in that it involves a reorganized debtor consisting of the debtor and another entity. It further finds that the distinction between that case and the case at bar—the fact that the retained avoidance actions were brought by the debtor in possession pre-confirmation— is not significant in view of this Court's holding, *supra*, that avoidance actions are within the purview of § 1123(b)(3)(B).

In another adversary proceeding in the Amarex bankruptcy a different defendant raised the same issue. *Temex v. Hastie and Kirschner (In re Amarex)*, 96 B.R. 330 (W.D.Okla.1989). In *Temex* the court concluded that a party seeking to enforce a claim who is neither the debtor nor the trustee must establish two elements pursuant to § 1123(b)(3)(B): first, that the party has been "appointed" and second, that it is a "representative of the estate." 96 B.R. at 334. The *Temex* court agreed with other courts holding that provisions of confirmed plans of reorganization conferring on a particular party the right to bring a particular action are sufficient to "appoint" that party under § 1123(b)(3)(B). *Id.*

Concerning whether the party is a "representative of the estate" the court adopted the position of courts that use a case-by-case analysis to determine whether the appointed representative's recovery would benefit the estate and the unsecured creditors. *Id.* The court noted that many courts have defined the benefit to unsecured creditors "broadly to include instances in which the purported representative's successful prosecution of the claim would increase the financial assets of the debtor's successor-in-interest and would thus increase the value of the ownership rights in

the successor-in-interest held by the unsecured creditors." *Id.*

In *Temex* the court found that provisions in the plan were sufficient to appoint Temex. *Id.* The unsecured creditors were benefitted because they received shares in Temex's parent corporation. *Id.* In turn, any benefit to Temex as a result of the recovery "would also benefit Temex's parent corporation and, implicitly, those individuals such as Amarex's unsecured creditors who possess ownership rights in [the parent corporation]." *Id.* For these reasons, the court found Temex was a "representative of the estate." 96 B.R. at 335.

Concerning Ozar's appointment, the decisions in *Chase & Sanborn, Southern Commodity, AOV Industries, Amarex* and *Temex* are directly on point and have a common factual thread: none involved formal proceedings in or "magic words" from the bankruptcy court intended specifically to appoint the representative, yet in each case the court held that the relevant entity was the properly appointed representative of the estate to bring the avoidance actions. In each case, the court based its decision on provisions in a plan confirmed by Order of the bankruptcy court and such was sufficient. *Chase & Sanborn*, 813 F.2d at p. 1180 n. 1; *Southern Commodity*, 78 B.R. at 627; *AOV Industries*, 62 B.R. at n. 1; *Amarex*, 88 B.R. at 363; *Temex*, 96 B.R. at 334.

In this case, the record is replete with proceedings and court Orders recognizing the formation of KOLP and the possibility that Ozar would participate in the debtors' reorganization or liquidation and would ultimately become one of the representatives of the estate charged with bringing avoidance actions.[11] Moreover, the Confirmation Order specifically concluded that the Managing Agent would have all the powers of a bankruptcy trustee to avoid transfers under and pursuant to §§ 545, 547–551, and 553. Confirmation Order at p. 32. Ozar is not the "stranger to the estate" that defendants assert he is. This Court authorized the Kroh Entities to enter into an agreement with Ozar and provided that he would

---

**11.** *See discussion supra* at pp. 490–491.

be deemed a party in interest entitled to file a plan or plans of reorganization in these cases.[12] The Ozar Partnership was a Plan proponent and was fully described and discussed in all versions of the Plan and Disclosure Statement.[13] Likewise, all versions of the Plan and Disclosure Statement as well as the Confirmation Order contemplated that Ozar would bring these avoidance actions post-confirmation. *Id.* To now contend that he is not properly appointed pursuant to § 1123(b)(3)(B) flies in the face of the proceedings leading up to and including plan confirmation. Therefore, the Court holds that Ozar has been properly appointed within the purview of § 1123(b)(3)(B).

The Court further concludes that, based on the undisputed testimony at the hearing, the substantial financial recovery in this proceeding and in the adversary proceedings will substantially benefit the unsecured creditors. The Court is firmly convinced that the 50–50 split between the unsecured creditors and the Ozar Partnership has more than an indirect benefit to the unsecured creditors. *See Temex,* 96 B.R. at 334–35. Here, the minimum pleaded claim against defendant, set forth in Count I of the complaint, is in excess of $400,000. If recovered, the unsecured creditors will receive their proportionate share of at least half that amount. This direct benefit to the unsecured creditors surpasses the indirect benefit found sufficient in decisions such as *Temex* and *Amarex.* The 50–50 split does not prevent creditors' recovery. The Court concludes that, financially, this situation is no different in its ultimate effect than postpetition financing with repayment to a creditor or other investor.

Additionally, the Court gives great deference to the fact that there was an overwhelming vote in favor of the Plan by the Class 6 unsecured creditors. The Court notes that the Unsecured Creditors' Committee voted to accept the Plan prior to its confirmation. The evidence is clear that absent advances and loans from the Ozar Partnership and the Partnership's property management, real estate and financial expertise, there would have been no further reorganization and no active liquidation. The properties would have been either returned to the secured creditors or sold at "fire sale" prices. To conclude that this reorganization is proceeding successfully, then to conclude all efforts to reorganize should be terminated is untenable. The Court disagrees with defendant's argument that the benefit to the estate is irrelevant. As in *Temex,* the Court concludes that the benefit of the recovery to the unsecured creditors is a relevant factor in determining whether a party is a "representative of the estate." The court further concludes that any recovery in this proceeding, Ozar's actions as Managing Agent, and the actions of the Ozar Partnership will benefit the unsecured creditors. Accordingly, this Court holds that Ozar is a "representative of the estate" within the meaning of § 1123(b)(3)(B).

For similar reasons, the Court also concludes that defendant's arguments concerning the absence of any fiduciary duties between Ozar and the estate and the characterization of Ozar as a "liquidator" are without merit. Defendant cites as an example of Ozar's lack of fiduciary duties the manner in which the adversary proceedings have been instituted. Defendant alleges that threatening demand letters have been sent, needless litigation has been entered into, and the defendants in the suits have been subjected to discovery allegedly designed to compel settlement rather than the fair adjudication of the cause of action. Defendant concludes that this situation would not occur if a "fiduciary" were in charge of litigating the adversary proceedings.

Defendant offered no evidence in support of this argument at the hearing. However, Galvin testified that negotiations with varyious parties are always occurring. In each instance where there has been a potential preferential transfer or fraudulent conveyance pre-filing negotiation has been attempted. Galvin specifically testified that

---

**12.** *See supra* n. 9, "Order and Judgment" at p. 2.

**13.** *See discussion supra* at p. 491.

pre-filing negotiations were entered into with this defendant. Unfortunately, those negotiations were not successful and this proceeding was filed. However, one count of plaintiffs' lawsuit was dropped as a result of the meeting. The Court is not persuaded by allegations that such meetings were intended as a form of harassment rather than good faith attempts to meet and resolve differences.

Another example of Ozar's purported lack of fiduciary duty raised by defendant concerns the manner in which discovery has been served in this case. Defendant asserts that the practice of serving standardized discovery requests with the complaint is intended to raise the costs of defending the adversary proceedings and force defendants into settlement. Defendant presented no evidence in support of this position at the hearing. The Court notes that serving discovery simultaneously with a complaint is not unusual. In large, complex bankruptcy proceedings such as these the practice is cost-saving for both the estate and the defendant.[14] In fact, it would be unreasonable and costly to custom-draft discovery requests for each defendant and only after previous discovery requests had been answered. Each time a file is handled, the cost of litigation is increased for both parties. For KOLP, these additional costs for custom-drafted discovery after filing of the complaint would come out of the creditors' pockets. Although not necessary to its holdings, the Court concludes that defendant's contentions that plaintiffs did not act as a trustee or debtor in possession would under similar circumstances are without merit.

The Plan is, at the *very least*, adequate in its provisions concerning what Ozar may or may not do with respect to prosecuting or compromising avoidance actions and Ozar's relations with the Panel in that regard. The evidence in this proceeding shows that when there have been choices to make and when those choices would have benefitted the Ozar Partnership at the expense of the unsecured creditors, the Ozar Partnership has chosen the alternative most beneficial to the unsecured creditors.[15] No abuse of the avoiding powers has been demonstrated. Concerning defendant's allegation that Ozar is an overpaid "liquidator", the Court, like the creditors who overwhelmingly approved the arrangement to compensate the Ozar Partnership, concludes that such compensation can only benefit the estate. In return for that compensation the Ozar Partnership has the responsibility of revitalizing and selling estate property at an enhanced value. The creditors in this case voted in favor of this "Ozar added value" and against a "fire sale" liquidation because they astutely realized that half of something is better than all of nothing.

Concerning defendant's argument that the avoidance actions were assigned, this Court concludes that they were retained rather than assigned. *Compare, e.g., Southern Commodity Corp.,* 78 B.R. 626 *with Sweetwater,* 55 B.R. 724. It is true, as defendant asserts, that there is a long line of cases either holding that the avoiding powers cannot be transferred to a single creditor or group of creditors for their sole benefit, or in which a single creditor or group of creditors was denied the right to pursue preference or fraudulent conveyance actions because the court held that only a trustee or debtor in possession could exercise those powers.[16] These cases are

---

**14.** For example, in *In re Campbell 66,* Case No. 86-01697-S-1 (W.D.Mo.), 286 adversary proceedings were filed within a one year period. In each proceeding, discovery was served with the complaint to avoid unnecessary expense to the estate.

**15.** *See e.g.,* discussion *supra* at pp. 492–93.

**16.** *Saline State Bank v. Maholch,* 834 F.2d 690 (8th Cir.1987) (single creditor cannot bring an action to avoid preferential transfer.); *Nebraska State Bank v. Jones,* 846 F.2d 477 (8th Cir.1988)

(single creditor cannot bring an action to avoid fraudulent conveyance); *Gerken v. Harris (In re Auxano, Inc.),* 87 B.R. 72 (Bankr.W.D.Mo.1988) (Koger); *In re Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857[6] (10th Cir.1986) (unfair and against bankruptcy policy to allow one creditor to recover preferential transfers because purpose of bankruptcy is to treat all similarly situated creditors alike); *Hansen v. Finn (In re Curry & Sorensen, Inc.),* 57 B.R. 824, 828 (9th Cir. BAP 1986) (creditors lacked standing to bring action under § 548 without prior court approv-

easily distinguishable from the case at bar either factually or because they involved the transfer of the avoidance powers rather than their retention pursuant to § 1123(b)(3)(B).

Finally, at the hearing, defendant raised the issue that confirmation of the Plan should have been delayed until prosecution of the avoidance actions was complete. During closing argument, defendant cited to several bankruptcy proceedings in which plans of reorganization were not confirmed until actions such as the adversary proceedings were prosecuted. In response, plaintiff pointed out that in each instance cited by defendant the attempted reorganizations were unsuccessful and the creditors received nothing. This Court does not operate in a vacuum. It must consider what is common sense and what makes good business sense and must apply business principles and judgment in rendering decisions such as this one. The Court notes that many, if not most, reorganizations fail. In this bankruptcy proceeding reorganization is proceeding successfully, a fact which defendant conceded in closing argument. Defendant's suggestions that the Plan should not have been confirmed and that this reorganization should be "shut down" are unsound.

■ Accordingly, for the reasons set forth above, the Court holds that the avoidance actions were properly retained pursu-ant to § 1123(b)(3)(B). It also holds that the Managing Agent, currently Ozar, is a properly court appointed "representative of the estate" within the purview of § 1123(b)(3)(B) and is a fiduciary of the estate. Based on these holdings, the Court further holds that Ozar, as Managing Agent, has standing to bring this action.

■ Concerning Debtors' standing, § 1123(b)(3)(B) anticipates that a debtor may enforce any claim or interest belonging to the debtor or to the estate. The retention of the Causes of Action by KOLP, 50% of which Debtors own, is sufficient in this Court's view to hold that the avoidance actions were also retained by the Debtors within in the meaning of § 1123(b)(3)(B). Accordingly, the Court holds that Debtors also have standing to bring this action.

Plaintiffs have raised the additional issue of *res judicata.* They argue that defendant, while not a creditor of the estate during pre-confirmation and confirmation proceedings, admits to notice of the standing issue and is therefore barred from raising it in this proceeding. Because the Court has ruled on the merits of the standing issue, it is not necessary to reach the issue of *res judicata.*

Both plaintiffs and defendant raise the issue whether it would be equitable to allow plaintiffs standing in this proceeding.

al); *In re Sweetwater,* 55 B.R. 724 (D.Utah) (assignee of debtor's claims lacked standing to bring avoidance actions purportedly assigned); *Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Products Corporation),* 69 B.R. 901 (D.N.J.1987) (right to recover preferential transfers held nonassignable); *In re V. Savino Oil & Hearing Co., Inc.,* 91 B.R. 655[1], [4] (Bankr.E.D. N.Y.1988) (statutory language specifies trustee as having standing to invoke avoidance powers, it appeared that the creditor's committee will pursue the claim, and individual creditors lack authority to institute avoidance actions except under extraordinary circumstances); *Foster Development Co. v. Morning Treat Coffee Co. (In re Morning Treat Coffee Co.),* 77 B.R. 62 (Bankr.M. D.La.1987) (avoiding powers are not "property of the estate" and cannot be sold or transferred as such under §§ 1123(a)(5), (b)(4); § 1123(a)(3) provides only for the *retention* of claims, not avoiding powers); *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.,* 58 B.R. 357 (S.D.Tex.1986) (the right to bring a preference action could not be assigned and assignee had no standing to bring suit against defendants); *Drinker, Biddle & Reath v. Bacher (In re Bacher),* 47 B.R. 825[7] (Bankr.E.D.Penn.1985) (creditor did not have standing to avoid transfer of real estate because the § 548 avoiding power is available only to the trustee); *Skinner v. Teal (In re Teal),* 35 B.R. 360[3] (Bankr.E.D.Penn.1984) (§ 548 is limited to avoidance action brought by the trustee and debtor was not a trustee); *Exchange National Bank of Chicago v. Van Brock (In re Van Brock),* 33 B.R. 546 (Bankr.S.D.Fla.1983) (§ 548 can only be asserted by trustee or debtor in possession); *Russo v. Ciavarella (In Re Ciavarella),* 28 B.R. 823[1] (Bankr.S.D.N.Y.1983) (Chapter 13 creditor lacks standing to avoid preferential transfer to another creditor); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.),* 11 B.R. 930[9] (Bankr.E.D.N.Y. 1981) (neither a trustee nor a debtor in possession can assign, sell, or otherwise transfer the right to maintain a preferential transfer suit).

Defendant asserts that equity arguments are not sufficient to overcome the precedent on the issue of assigning or transferring the avoiding powers. The Court has previously distinguished the precedent referred to by defendant.[17] If the equities are found to be relevant by a higher court, the evidence and the Court's previous discussion concerning the benefit of Ozar's and the Ozar Partnership's actions to date are sufficient, in this Court's opinion, to outweigh the precedent cited by defendant.

Defendant further asserts that many of the avoidance actions filed by plaintiff to date are frivolous and it does not appear that the estate will be sufficiently damaged if they are not pursued. The Confirmation Order noted the enhanced recovery of preferential transfers and fraudulent conveyances under the Plan as opposed to a Chapter 7 liquidation. The Confirmation Order states that this enhancement is due to Ozar Partnership's obligation to make loans to KOLP, thus enabling KOLP to pursue complex but meritorious causes of action past the point where a trustee under a Chapter 7 liquidation would abandon or settle for less than their value for lack of resources. Confirmation Order at p. 19. Defendant offered no evidence to support a lack of damage to the estate if this and the Adversary Proceedings were dismissed or to contradict the Court's unappealed findings in its Confirmation Order. Plaintiffs' evidence, however, supports a conclusion that the estate will benefit from the adversary proceedings and will be damaged if they are not pursued. The Court therefore finds defendant's argument without merit.

■ Finally, defendant has also requested, by separate motion, that discovery in these proceedings be stayed pending appeal. That motion will be denied for the following reasons. First, as defendant recognized in its suggestions in support of the motion to stay, the decision to grant a stay of discovery is within the Court's discretion:

> [W]hen one issue may be determinative of a case, the court has discretion to stay discovery on other issues until the critical issue has been decided. In accordance with this principle—a salutary principle if it is applied sparingly and with real discretion rather than as an abosolute rule—a court may decide that in a particular case it would be wise to stay discovery on the merits until challenges to jurisdiction have been resolved.

8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2040 at p. 288 (West 1970).

Here, the parties were granted a stay of discovery in this and the other adversary proceedings until April 19, 1989, the date of the hearing on the standing issue. The Court rendered its decision on the record at the conclusion of that hearing. An interlocutory appeal of this issue, if granted, could take as much as two years before a final decision was reached. The Court decided in this opinion that plaintiffs have standing to maintain this action and should be allowed to proceed. The decision in this case will affect the adversary proceedings in which such an attack has or could be made. Moreover, defendants in many of the other adversary proceedings also requested a stay of discovery pending appeal of the standing issue. If discovery is stayed in all the adversary proceedings the post-confirmation proceedings will grind to a halt. The Court will not do indirectly what it has refused to do directly. It will not undermine its decision to allow proceedings to go forward by staying discovery pending a determination on an interlocutory appeal.

It is this Court's firm conclusion that the requested stay of discovery pending any appeal should be denied. However, if a higher court determines that a stay should be granted, this Court recommends the stay be conditioned upon the filing of a supersedeas bond in the amount prayed for in the complaint plus two years interest to cover the estimated time for an appeal through the Eighth Circuit.

For the reasons set forth in this opinion, it is

---

17. *See supra* at p. 500.

ORDERED that the defendant's Motion to Dismiss for Lack of Standing is denied. It is further

ORDERED that defendant's Motion to Stay Discovery Pending Determination of Motion to Dismiss for Lack of Standing is denied.